**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **STEVEN BRADLEY, STEPHEN CRANE, NOAH HILES, BARBARA AUGSDORFER, AND LOGAN BARRY** *on behalf of themselves and all others similarly situated,*<br><br>        *Plaintiffs,*<br><br>                v.<br><br>  **GANNETT CO. INC.,**<br><br>        *Defendant.* | **FIRST CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br>**Civil Action No.: _____** |

## <u>FIRST CLASS ACTION COMPLAINT</u>

Plaintiffs, Steven Bradley, Stephan Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry ("Named Plaintiffs"), individually and on behalf of other persons similarly situated (collectively "Plaintiffs" or "Class Members"), by and through their attorneys, bring this class action complaint against Gannett Co., Inc., ("Gannett" or "Defendant"), and allege as follows:

## <u>NATURE OF ACTION</u>

1.      Named Plaintiffs brings this action on behalf of themselves and all others similarly situated against Defendant as a result of Defendant's implementation of policies that discriminated against non-minorities on the basis of their race.

2.      Plaintiffs are all individuals who were subject to the Defendant's Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

3.      As the Supreme Court recently emphasized in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141, 2147 (2023), "[e]liminating racial discrimination means eliminating all of it."

4.      "One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000).

5.      This action seeks an injunction to seek an immediate end to Gannett's Reverse Race Discrimination Policy.

6.      In addition, this action seeks all other forms of legal and equitable relief available to redress the harms suffered by those individuals subject to Gannett's Reverse Race Discrimination Policy.

## JURISDICTION AND VENUE

7.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

8.      Venue is proper within the Eastern District of Virginia under 28 U.S.C. § 1391 as defendant is headquartered in this District.

## THE PARTIES

### Named Plaintiffs

9.      Named Plaintiff Steven Bradley worked for Gannett from 1999-2020 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Bradley and also governed any consideration Gannett would give to Mr. Bradley's prospective work for the company.

10.     Nonetheless, Mr. Bradley was subject to Gannett's Reverse Race Discrimination Policy.

11.     Named Plaintiff Stephen Crane worked for Gannett from 2019-2021 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Crane.

12.     Nonetheless, Mr. Crane was subject to Gannett's Reverse Race Discrimination Policy.

13.     Named Plaintiff Noah Hiles worked for Gannett from 2021-2022 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Hiles and also governed any consideration Gannett would give to Mr. Hile's prospective work for the company.

14.     Nonetheless, Mr. Hiles was subject to Gannett's Reverse Race Discrimination Policy.

15.     Named Plaintiff Barbara Augsdorfer worked for Gannett from 2020-2021 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mrs. Augsdorfer.

16.     Nonetheless, Mrs. Augsdorfer was subject to Gannett's Reverse Race Discrimination Policy.

17.     Named Plaintiff Logan M. Barry worked for Gannett from 2019-2020 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Barry and also governed any consideration Gannett would give to Mr. Barry's prospective work for the company.

18.     Nonetheless, Mr. Barry was subject to Gannett's Reverse Race Discrimination Policy.

*Defendant*

19.     Gannett is a Delaware corporation with its principal place of business located at 7950 Jones Branch Drive, McLean, Virginia 22107. Defendant is a mass media holding company

3

and one of the largest newspaper publishers in the United States. Defendant owns the USA Today, as well as numerous local newspapers throughout the nation, comprising the USA Today Network (collectively "Gannett Publications").

20.     At all relevant times, the Class Members worked or applied for a position at Gannet; were thus entitled to protection from Gannett based on the relevant laws; and were harmed by being subject to Gannett's Reverse Race Discrimination Policy.

## FACTS

21.     In 2020, Gannett publicly acknowledged a company-wide policy which was purportedly designed to achieve inclusion quotas, but practically speaking disadvantaged class members in terms of their work for the company. ("Reverse Race Discrimination Policy"). Therefore, regardless of the actual applicant, pool Gannett committed that by 2025, that the staff demographics of all Gannett publications would reflect the racial and ethnic demographics in the community the newsroom covers, but not the demographics of the job applicant pool.

22.     In Gannett's 2020 Inclusion Report, Gannett specifically noted their goals through 2025, which included the goal to "[a]chieve racial and gender parity with the diversity of our nation, throughout our workforce."[1]

23.     Gannett's commitment is simple, to hire and promote a certain percentage of individuals on the basis of their skin color and without regard to the relevant applicant pool.

24.     In order to reach the racial quotas by 2025, Gannett committed to publishing detailed demographics of the racial composition of their workforce on an annual basis.[2]

---

[1]     *See* Gannett 2020 Inclusion Report, *available at* https://www.gannett.com/wp-content/uploads/2021/09/Gannett_2020_Inclusion_Report-1.pdf.

[2]     *See id.*

25.     The 2020 Inclusion Report also represented that Gannett would hold their leadership accountable to meet this defined objective.

26.     Indeed, upon information and belief, Gannett leadership were entitled to certain bonuses and promotions, and given awards, incentivizing them to staff their newsroom's workforce with workers of racial and ethnic backgrounds to parity the racial demographics of the communities they serve regardless of racial and ethnic demographics of the applicant pool for each position.

27.     For example, an article published by Gannett Publication, Democrat & Chronicle, on August 20, 2020, states that their goal "can accelerate most dramatically if the D&C hires more journalists of color."[3]

28.     This article goes on to state that "[w]e have more hires in the works I'll tell you about later this year that will help us reflect better the full range of people who live in greater Rochester," and notes "[w]e need more Black front-line reporters. And we remain far short of the number of Latino reporters, photographers and editors we should have in a Monroe County with tens of thousands of Latino residents."[4]

29.     Gannett moved forward with the implementation of the Reverse Race Discrimination Policy resulting in numerous highly qualified non-minority individuals finding their work relationship terminated or suffering other adverse actions based purely on their race.

---

[3]     *See From the editor: 'D&C' pledges to serve and reflect entire set of communities it serves*, DEMOCRAT AND CHRONICLE, (Aug. 20, 2020), *available at* https://www.democratandchronicle.com/story/news/2020/08/20/democrat-and-chronicle-editormakespledge-on-diversity-and-inclusion/5603997002/.

[4]     *See id.*

30.     Indeed, upon information and belief, the former Gannett employee that was tasked with overseeing talent recruitment and retention, Hollis Towns, informed Gannett managers that no more straight White males should be hired going forward.

31.     Gannett executed their Reverse Race Discrimination Policy with a callous indifference towards civil rights laws or the welfare of the workers, and prospective workers, whose lives would be upended by it.

## CLASS ACTION ALLEGATIONS

32.     Named Plaintiffs and class members' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

33.     The Rule 23 Class consists of: all individuals who were subject to the defendant's Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

34.     Numerosity is satisfied as the Class size is believed to be over 40 members. For example, Gannett has over 100 brands employing newsroom members who were subject to the Reverse Race Discrimination Policy. Thus, the Class is so numerous that joinder of all Class Members is impracticable.

35.     Common issues of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. Among the common issues of law and fact are the following:

- Whether an injunction to end Gannett's Reverse Race Discrimination Policy is warranted;

- Whether Defendant subjected their workers to the policy described herein;

6

- Whether Defendant's Reverse Race Discrimination Policy amounts to discrimination or preferential treatment on the basis of race;

- Whether plaintiffs are entitled to declaratory relief that Defendants have violated 42 U.S.C. § 1981;

- Whether equitable remedies, compensatory damages, and punitive damages for the Class's are warranted;

36. Named Plaintiffs' claims are typical of the Class Members' claims because Named Plaintiffs, like other Class Members, were comparably injured through Defendant's wrongful conduct as described above.

37. Further, Named Plaintiffs have no interest antagonistic to the Class, and have retained Dimuro Ginsberg, PC, and Thomas & Solomon LLP as counsel.

38. Dimuro Ginsberg, PC, and Thomas & Solomon LLP are qualified and able to litigate Named Plaintiffs' and Class Members' claims.

39. Dimuro Ginsberg, PC, intends to move to for attorneys from Thomas & Solomon LLP to submit an application for *pro hac vice* admission in this matter.

40. Thomas & Solomon LLP concentrates its practice in litigation, and its attorneys are experienced in class action litigation.

41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and avoids duplication by allowing these claims to be prosecuted in a single action. Named Plaintiffs and Class Members lack the resources to adequately prosecute separate claims, and the amounts that each individual stand to recover makes individual cases impractical to pursue. Further, the costs for the court system for adjudication of individualized litigation would be substantial. The only practical chance for Class Members to obtain recourse is through a class action.

42.     The Class is maintainable under subsection (2) of Rule 23(b) because Defendant has acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive and other equitable relief in favor of the class as a whole.

43.     The Class is also maintainable under Rule 23(c)(4) because resolution of the common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

## CLAIMS OF REPRESENTATIVE PLAINTIFFS

### *Steve Bradley*

44.     As a content strategist and newsroom leader, Mr. Bradley occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

45.     Indeed, the implementation of this policy resulted in the termination of numerous well qualified workers based purely on their non-minority status, including Mr. Bradley, whose work relationship was terminated after working for the Democrat and Chronicle for 21 years.

46.     There can be no question that Mr. Bradley's termination was directly based on his race and resulted from the Reverse Race Discrimination Policy. For example, the Democrat and Chronicle's executive editor commented that he decided to terminate Mr. Bradley's employment rather than another worker, Mark Liu, because Mr. Liu was Asian and Mr. Bradley was White.

47.     As another example, simultaneously with Mr. Bradley's termination, a non-minority member of the sports writing staff for approximately 37 years with Gannett Newspapers, including the Democrat and Chronicle, was also terminated solely on the basis of his non-minority status. No non-minority members of the sports writing staff were terminated during this time period.

48.     To make matters worse, not only was Mr. Bradley illegally terminated from one position with the Democrat and Chronicle as a result of the Reverse Race Discrimination Policy,

he was also later rejected, solely on the basis of his race, from a position for different Gannett Publications for which he was undoubtedly qualified.

49.     In or around January 2021, Mr. Bradley submitted an application for the open position of executive editor of Gannett's Mohawk Valley operations, including the Utica Observer-Dispatch.

50.     After submitting his formal application and conducting at least 3 interviews, Mr. Bradley was informed that he was under serious consideration for the position and by February 2021, was informed that he was one of two finalists, the other finalist also being a White male.

51.     Thereafter, after the search and interview process for the executive editor position went dark for approximately one month, in mid-March 2021 Mr. Bradley was informed that a new candidate emerged and was selected for the position, who he later learned was Sheila Rayam.

52.     Ms. Rayam, a Black female, was selected for the position over Mr. Bradley as a result of Gannett's Reverse Race Discrimination Policy. Indeed, she was selected over Mr. Bradley despite not having expressed interest or applying in the first instance, and despite having far less qualifications than Mr. Bradley, including no prior newsroom management experience, having only previously worked as a reporter and community engagement editor.

53.     In the Utica Observer-Dispatch article announcing Ms. Rayam's hire, Gannett made it a large point of emphasis to note that she was the first Black executive editor for Gannett's Mohawk Valley operations.[5]

---

[5]     *See Sheila Rayam to lead Gannett's Mohawk Valley newsrooms*, UTICA OBSERVER-DISPATCH, (March 22, 2021), *available at* https://www.uticaod.com/story/news/2021/03/22/sheila-rayam-editor-utica-observer-dispatch-herkimer-times-telegram/4798569001/.

54.     Gannett could not provide any explanation, other than enforcement of their Reverse Race Discrimination Policy, concerning how someone far less qualified who was not even under consideration for the position when he was informed they were down to two finalists was selected over Mr. Bradley.

55.     Indeed, a later interview Ms. Rayam gave reflecting back on the executive editor position for Gannett's Mohawk Valley operations states that she was approached about the position and asked if she'd like to run her own newsroom.[6]

56.     Because of the Reverse Race Discrimination Policy, Gannett chose not to hire Mr. Bradley on the basis of his race and instead went outside the applicant pool and hand selected a candidate that, irrespective of her qualifications, satisfied the quotas Gannett was seeking to achieve.

57.     There can be no doubt Mr. Bradley's job performance was not the reason he was not hired. On the contrary, Mr. Bradley was a distinguished worker of Defendant, receiving multiple awards and recognitions for his contributions and leadership.

***Stephen Crane***

58.     As an editor and newsroom leader, Mr. Crane occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

59.     In March 2020, as a result of the Reverse Race Discrimination Policy, Katrice Hardy, a Black woman, was appointed to serve as executive editor of The Indianapolis Star, which also entailed overseeing more than two dozen Gannett newsrooms throughout Indiana, Illinois and Kentucky, including The Reporter Times, Mooresville-Decatur Times,  The Herald-Times, and

---

[6]     *New Buffalo News Editor Credits Buffalo State for Early Success*, BUFFALO STATE, (Oct. 24, 2022), *available at* https://suny.buffalostate.edu/news/new-buffalo-news-editor-credits-buffalo-state-early-successes.

Hoosier Topics, was appointed by Gannett to lead efforts to compile the demographic newsroom workforce data used to spearhead the Reverse Race Discrimination Policy.

60.     As a result of the Reverse Race Discrimination Policy, Ms. Hardy directly discriminated against Mr. Crane based on his non-minority status, directly affecting his ability to adequately perform his job responsibilities.

61.     For example, while serving as editor, Mr. Crane was informed that only minority candidates should be sought for open positions he was charged with filing. In one instance, as a result of the Reverse Race Discrimination Policy, he was forced to rescind an offer he made to a White male, despite the fact that he tried, but could not find enough qualified minority applicants.

62.     As a result of the Reverse Race Discrimination Policy, Ms. Hardy also directly discriminated against Mr. Crane based on his non-minority status with a biased non-objective performance evaluation, citing two instances of race-based editorial directives. Despite Mr. Crane's objections to her evaluation, Ms. Hardy stood her ground, forcing Mr. Crane to file a complaint with HR.

63.     Indeed, despite outstanding performance across all metrics, the biased non-objective performance evaluation received was in retaliation for Mr. Crane voicing discomfort over directives he received stemming from the Reverse Race Discrimination Policy.

64.     Given that HR supported Ms. Hardy's enforcement of the Reverse Race Discrimination Policy, Mr. Crane felt he had no other choice than to resign in May of 2021.

65.     In a column published on his last day at The Herald-Times, Mr. Crane wrote that the "last year [had] been the most difficult of my life."

### Noah Hiles

66.     As a sports reporter, Mr. Hiles occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

67.     Mr. Hiles was subject to discrimination based on his non-minority status before he was even brought on as a sports reporter for the Beaver County Times in April 2021. Indeed, despite local leaders of the Beaver County Times expressing a desire to hire him immediately in light of his impressive credentials and experience, as a result of the Reverse Race Discrimination Policy, his hiring was delayed for approximately two months, purely on the basis that he did not fit the minority status needed to satisfy defendants' racial quotas.

68.     Two months into starting the position, the sole other member of the Beaver County Times sports staff quit, leaving Mr. Hiles as the leader and *de facto* sports editor. Here, *inter alia*, Mr. Hiles took on additional roles such as creating the sports budget on a weekly basis, along with giving coverage assignments to freelance reporters and photographers.

69.     Despite taking on additional roles and serving as the leader and *de facto* sports editor, as a result of the Reverse Race Discrimination Policy, Defendant refused to provide Mr. Hiles the pay and job title associated with the work he was performing.

70.     Not only did the Reverse Race Discrimination Policy result in Mr. Hiles not receiving the pay and job title associated with the work he was performing, it resulted in Mr. Hiles being discriminated against on the basis of pay even assuming he was not performing the additional roles.

71.      Understanding that the Beaver County Times was looking to hire additional individuals for their sports staff, Mr. Hiles offered to use his contacts to help fill the openings. At

this point, as a result of the Reverse Race Discrimination Policy, he was informed that the position needed to be filed by a minority.

72.     Thus, in good faith, Mr. Hiles started reaching out to his contacts that satisfied the minority pre-requisite about the position. After offering the position to two other minority candidates, each of which ultimately rejected the offers, the Beaver County Times hired one of the minority workers that Mr. Hiles introduced as part of his outreach efforts, Parth Upadhyaya.

73.     Despite Mr. Hiles having more experience, a proven track record of success, including by serving as the *de facto* sports editor, and overseeing Mr. Upadhyaya on a daily basis, in August 2021, Mr. Hiles found out that Mr. Upadhyaya's salary was approximately 17% higher than he was earning.

74.     Upon this revelation and given that he was working as the *de facto* sports editor, Mr. Hiles approached management about a raise. He was informed that due to the Reverse Race Discrimination Policy, they had to pay Mr. Upadhyaya the higher salary to ensure they satisfied their racial quota and that he would accept the position. Mr. Hiles was further informed that he would have to wait until at least a year of working for Defendant before a raise could even be considered.

75.     Even when Mr. Upadhyaya's performance became an issue, leading Mr. Hiles to take an even more active role in overseeing Mr. Upadhyaya's work, management still maintained Mr. Upadhyaya's salary at approximately 17% higher than Mr. Hiles, noting the difficulty they would face replacing Mr. Upadhyaya with another minority worker.

76.     Nevertheless, Mr. Hiles continued to excel, outperforming Mr. Upadhyaya in every metric.[7] Yet, even after delaying any raise five months beyond the one-year period previously discussed, with the raise Mr. Hiles received, he was still being paid less than Mr. Upadhyaya.

77.     Gannett could not provide any explanation to Mr. Hiles, other than the Reverse Race Discrimination Policy, concerning how someone far less qualified, with fewer responsibilities and incomparable accolades, should be entitled to a higher salary.

78.     Gannett chose to pay Mr. Upadhyaya approximately 17% higher than Mr. Hiles on the basis of their respective races, so Gannett could satisfy the quotes they were seeking to achieve set forth in their Reverse Race Discrimination Policy.

**Barbara Augsdorfer**

79.     As a reporter, Mrs. Augsdorfer occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

80.     After the 2019 merger which placed the Savannah Morning News under Gannett, it became clear that steps were being taken so Gannett could satisfy the racial quotas they were seeking to achieve through their Reverse Race Discrimination Policy.

81.     In June 2020, roughly 6 months after Mrs. Augsdorfer was hired at the Savannah Morning News, as a result of the Reverse Race Discrimination Policy, Rana L. Cash, a Black woman, was hired to replace Susan Catron as the executive editor of the Savannah Morning News. Ms. Cash spearheaded Gannett's Reverse Race Discrimination Policy for the Savannah Morning

---

[7]     While working as a sports writer, Mr. Hiles was a distinguished worker of Gannett. He earned a "top 10" spot in multiple categories among the top sports writers in the United States at the Associated Press Sports Editors Awards, was honored as a finalist in the national Best of Gannett awards during the Division III Sports Reporting category, was awarded first place in the Sports Beat Reporting and Sports Feature categories at the 2022 Pennsylvania NewsMedia Association Keystone Awards, and earned two first-place awards and was a finalist for another category in the 2022 Press Club of Western PA Golden Quills Awards.

News, emphasizing the need to hire more Black newsroom workers regardless of the discriminatory impact, noting that Gannett "must find new and creative ways to change the face of [their] company."[8]

82.   With respect to the Savannah Morning News, pursuant to the Reverse Race Discrimination Policy, from 2020 to 2022, the number of White workers decreased by 27.4%, while the number of Black workers increased by 18.2%.

83.   One of the "new and creative ways" to make room for hiring another Black newsroom worker as part of the Reverse Race Discrimination Policy, started in August 2021, when Mrs. Augsdorfer's work assignment was surprisingly transferred from covering education and nonprofits to covering two local counties, Bryan County and Effingham County.

84.   Despite performing well and expressing a desire to continue coverage of education and nonprofits, Mrs. Augsdorfer was told that the transfer was necessary as coverage of these counties was a necessity. However, this was clearly not the case.

85.   Soon after her coverage was transferred, as part of the Reverse Race Discrimination Policy, a Black worker was hired to cover education and non-profits. Moreover, when this occurred, Mrs. Augsdorfer was instructed to turn over all her contacts from her time covering education and non-profits, which she graciously did. However, when she requested contacts associated with the two local counties she was now assigned to cover, she was denied.

---

[8]   *On matters of race, our newsroom has fallen short. Here's how we'll be better for Savannah*, Rana L. Cash, SAVANNAH MORNING NEWS, (Aug. 20, 2020), *available at* https://www.savannahnow.com/story/special/2020/08/20/on-matters-of-race-our-newsroom-has-fallen-short-herersquos-how-wersquoll-be-better-for-savannah/114851796/.

86.     Moreover, soon thereafter, to Mrs. Augsdorfer's surprise, she was informed for the first time that her performance was not up to par, placed on a performance plan, and then ultimately had her work relationship terminated in November 2021.

87.     It became clear that the transfer from education and nonprofits and subsequent placement on a performance plan, was not the result of an apparent need for coverage in another area or job performance, but a creative ploy to fulfill the Reverse Race Discrimination Policy and make room to hire another Black newsroom worker in Mrs. Augsdorfer's place. Indeed, after Mrs. Augsdorfer's termination, no one was hired to cover the two local counties that she was informed necessitated her transfer.

### *Logan Barry*

88.     As a multimedia local government reporter, Mr. Barry occupied on of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

89.     Mr. Barry was hired by The Progress-Index in June 2018 to serve as a multimedia reporter covering local and state government, including a focus in economic development, as well as general and community news.

90.     While working as a multimedia reporter covering local and state government, Mr. Barry excelled at his duties to the point that management informed him that he was amongst the highest performers in the newsroom and that they intended to tap him for what he understood to be a full-time leadership role.

91.     After the 2019 merger which placed The Progress-Index under Gannett, it became clear that steps were being taken so Gannett could satisfy the racial quotas they were seeking to achieve.

92.     Despite previously being informed by management that he was amongst the highest performers in the newsroom and that they intended to tap him for a leadership role, and urging him to stay on for that purpose, without any notice or even the opportunity to formally apply, the full time leadership role was awarded to a Black woman, Leilia Magee.

93.     Gannett chose not to hire or even give Mr. Barry the opportunity to formally apply to the role on the basis of his race and instead hired a Black woman with less accolades and experience, that satisfied the racial quotas Gannett was seeking to achieve. Moreover, as a result of the Reverse Race Discrimination Policy, Mr. Barry's work relationship with Gannett was terminated.

### FIRSTCAUSE OF ACTION
*Race Discrimination – U.S.C. § 1981*
**(On behalf of Named Plaintiffs and the Class)**

94.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs as if fully restated herein.

95.     Under § 1981 of the Civil Rights Act, it is unlawful for a Defendant to discriminate against its workers because of their race.

96.     Defendant has engaged in an intentional, company-wide, and systematic practice of discrimination against non-minority workers, including by:

a.     Creating racial quotas with goals of having the racial demographic of a newsroom match the racial demographics of the location where the newsroom is located.

b.     Giving executives incentives to reduce the number of non-minority workers in their newsrooms.

c.     Giving preferential treatment to minority workers in hiring, promotions, salary, and other terms and conditions of their work relationship with Defendant.

17

97. Defendant's invidious race discrimination adversely and directly affected the terms, conditions, and privileges of Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, Logan Barry, and the Class's work relationship with Defendant.

98. As the direct and proximate result of Defendant's Reverse Race Discrimination Policy, Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, Logan Barry and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

99. Defendant's discriminatory and unlawful practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Named Plaintiffs Class. As a result, Named Plaintiffs and the Class are entitled to injunctive relief, compensatory, and punitive damages together with all other remedies available.

**WHEREFORE**, Named Plaintiffs and the Class demand judgment against Defendant in their favor and that they be given the following relief:

(a) an order certifying the Class as requested and designating Thomas & Solomon LLP as class counsel;

(b) designation of Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, and Logan Barry as the representatives of the Class;

(c) public injunctive relief requiring Defendant, its successors in office, agents, employees, and assigns, and all other persons acting in concert with them, to eliminate the Reverse Race Discrimination Policy;

(d) an award to Named Plaintiffs, and the Class, of the value of lost wages, back pay, including lost fringe benefits, which resulted from the discriminatory acts and practices of Defendant;

(e) liquidated damages in an amount equal to the sum of the amount of the Named Plaintiffs and the Class's lost wages, back pay, including fringe benefits, which resulted from the discriminatory acts and practices of Defendant;

18

(f)     an award to Named Plaintiffs and the Class of the value of future lost wages and lost future fringe benefits which resulted from the discriminary acts and practices of Defendants, or other appropriate equitable relief;

(g)     an award to Named Plaintiffs and the Class of civil penalties provided by the relevant statutes;

(h)     an award of consequential damages sustained by Named Plaintiffs and the Class as a result of the discriminatory acts and practices of the Defendant;

(i)     an award of punitive damages;

(j)     an award of compensatory damages in an amount determined by the jury to be able to reasonable compensate Named Plaintiffs and the Class for the humiliation, indignity, embarrassment, damage to her reputation, emotional distress, emotional pain and suffering and the loss of enjoyment of life they have endured as a result of Defendant's conduct;

(k)     awarding Named Plaintiffs and the Class appropriate relief, including awarding reasonable attorneys' fees, expenses, expert fees, and costs incurred in vindicating Named Plaintiffs, the Class's rights;

(l)     an award of pre- and post-judgment interest;

(m)     awarding a service payment for Named Plaintiffs Steve Bradley, Stephan Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry; and

(n)     such other and further legal or equitable relief as this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all questions of fact.

Dated: August 18, 2023          Respectfully submitted,

**/s/**_____

Bernard J. DiMuro, Esq.
1001 N. Fairfax Street, Suite 510
Alexandria, VA 22314
Telephone: (703) 684-4333
Email: bdimuro@dimuro.com

**THOMAS & SOLOMON LLP**
J. Nelson Thomas, Esq. (*pro hac vice admission anticipated*)
Adam T. Sanderson, Esq. (*pro hac vice admission anticipated*)
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
asanderson@theemploymentattorneys.com