IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| STEVEN BRADLEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-1100 (RDA/WEF) |
| | ) | |
| GANNETT CO. INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendant Gannett Co. Inc.'s Corrected Motion to Dismiss/Strike Class Allegations.  Dkt. 33.  This Court has dispensed with oral argument as it would not aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has been fully briefed and is now ripe for disposition.  Considering the Motion together with Defendant's Memorandum in Support (Dkt. 34), Plaintiffs' Opposition Brief (Dkt. 36), Defendant's Reply Brief (Dkt. 37), and Defendant's Notice of Supplemental Authority (Dkt. 50), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.[1][2]

---

[1] Defendant filed two motions to dismiss on January 8, 2024: a motion to dismiss (Dkt. 30) and a corrected motion to dismiss (Dkt. 33).  Because Defendant filed a corrected motion to dismiss, the corrected motion is the motion that the Court will address here and the original motion to dismiss (Dkt. 30) will be denied as moot.

[2] Also pending before the Court are Plaintiffs' Motions to Certify Class (Dkt. 38) and for Preliminary Injunction (Dkt. 40).  Given that the disposition of those motions depended on the resolution of the motion to dismiss, Magistrate Judge William E. Fitzpatrick stayed briefing on those matters pending resolution of the motion to dismiss.  Dkt. 49.  Accordingly, the motions to certify class and for preliminary injunction are not ripe for disposition on the merits but will be denied as moot given the results reached here.

## I.  BACKGROUND

### A.  Factual Background[3]

Plaintiffs Steven Bradley, Stephen Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry (collectively, "Plaintiffs"), assert that they are bringing the Amended Complaint (Dkt. 28) on behalf of themselves and on behalf of other persons similarly situated (the "Proposed Class").

Defendant is a mass media holding company and one of the largest newspaper publishers in the United States.  Dkt. 28 ¶ 19.  The newspapers it publishes include USA Today.  In 2020, Defendant acknowledged a company-wide policy (the "Policy")[4][5] that it asserted was designed to achieve "racial and gender parity with the diversity of our nation, throughout our workforce." *Id.* ¶¶ 21-22.  As part of the Policy, Gannett committed to publishing detailed demographics of the

---

[3] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[4] Oddly, Plaintiffs allege that, in 2020, "Gannett publicly acknowledged a company-wide policy," such that it is unclear when the policy was actually promulgated.  Importantly, Plaintiffs do not provide any specifics about the Policy.  Rather, the only specifics that Plaintiffs point to are included in a 2020 Inclusion Report.  Dkt. 28 at ¶ 22.  Plaintiffs purport to provide a link to the relevant 2020 Inclusion Report, Dkt. 28 at 4 n.1; however, attempting to access the link results in an error message.  It appears that Plaintiffs have attached the 2020 Inclusion Report with other briefing in this case.  Dkt. 41-4.  Thus, the Court was able to review the 2020 Inclusion Report.

[5] To the extent that the 2020 Inclusion Report is a written reflection of the "Policy" upon which Plaintiffs rely, it does not reflect the alleged quotas or caste system to which Plaintiffs refer.  The alleged hierarchy of races to which Plaintiffs refer appears nowhere in the 2020 Inclusion Report.  Dkt. 28 ¶ 31 (setting forth Plaintiffs' beliefs regarding a caste system).  There are also no references to any quotas in the 2020 Inclusion Report.  The Report does, however, note over a five-year period there are goals to: (i) "[I]ncrease the representation of People of Color in leadership positions by 30%"; and (ii) "achieve racial and gender parity with the diversity of our nation, through our workforce." Dkt. 41-4.  But the Report does not provide a specific mechanism for how to achieve this, other than measuring year-to-year trends and progress and the Report does not provide specific positions that would be targeted or specific mechanisms for achieving the goals of the policy.  *Id.*  Importantly, the Report does not appear to specifically embrace or call for reverse racism or for a prioritizing of race over any merit-based qualifications.  Indeed, the Report purports to embrace "[f]air treatment for all" and making sure that everyone "has equal opportunities to thrive." *Id.* at 4, 16.

racial composition of its workforce on an annual basis. *Id.* ¶ 24.  The Policy also represented that Defendant would hold its leadership accountable. *Id.* ¶ 25.  Plaintiffs allege that Defendant's leadership were entitled to certain bonuses and other benefits to incentivize them to increase the racial and ethnic demographics of their newsrooms. *Id.* ¶ 26.  Specifically, one Defendant publication noted that it needed "more journalists of color" in order to "reflect better the full range of people who live in greater Rochester," and, in particular, "[w]e need more Black front-line reporters" and "Latino reporters, photographers, and editors." *Id.* ¶¶ 27-28.

Plaintiffs believe that the Policy resulted in a "caste system," whereby (1) individuals of Asian ancestry received preference to White[6] individuals; (2) individuals of Hispanic or Latino ancestry received preference to White individuals and individuals of Asian ancestry; (3) individuals of American Indian or Alaska Native ancestry and individuals of Hawaiian or other Pacific Islander ancestry received preference to White individuals, individuals of Asian ancestry, and individuals of Hispanic or Latino ancestry; (4) individuals of Middle Eastern or North African ancestry received preference to White individuals, individuals of Asian ancestry, individuals of Hispanic or Latino ancestry, and individuals of American Indian or Alaska Native ancestry and individuals of Hawaiian or other Pacific Islander ancestry; and (5) individuals of Black or African American ancestry received preference to White individuals, individuals of Asian ancestry, individuals of Hispanic or Latino ancestry, individuals of American Indian or Alaska Native

---

[6] Although 42 U.S.C. § 1981 refers to "white citizens," Plaintiffs' use of "White" – as an apparent proxy for Caucasian – in the Amended Complaint is somewhat confusing because Latinos and Middle Eastern individuals sometimes also identify as White. *See, e.g.*, *Johnson v. Farmington Pub. Schs.*, 2024 WL 1395140, at *7 (E.D. Mich. Mar. 31, 2024) ("Herrara identifies alternatively as white or Latino."); *Eid v. Saint-Gobain Abrasives, Inc.*, 2008 WL 2095346, at *2 (E.D. Mich. May 16, 2008) (noting that "people of Middle Eastern descent are considered 'white employees' for purposes of the EEO-1 report").

ancestry and individuals of Hawaiian or other Pacific Islander ancestry, and individuals of Middle Eastern or North African ancestry. *Id.* ¶ 31.[7]

Plaintiffs assert that they seek to establish a class of individuals who: (i) work or worked for Defendant based on any form of contractual relationship; or (ii) "were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship." *Id.* ¶ 35.[8]  Plaintiffs assert that five common issues of law and fact exist as to all class members: (i) whether an injunction to end the Policy is warranted; (ii) whether Defendant subjected its workers to the Policy; (iii) whether the Policy amounts to discrimination or preferential treatment; (iv) whether Plaintiffs are entitled to declaratory relief; and (v) whether equitable remedies, compensatory damages, and punitive damages for the Proposed Class are warranted. *Id.* ¶ 36.

Plaintiffs also make specific allegations with respect to the individual Plaintiffs, who are also the proposed class representatives.

<u>Plaintiff Steven Bradley</u>

Plaintiff Bradley worked for Defendant from 1999 to 2020. *Id.* ¶ 9.  Plaintiff Bradley was a content strategist and newsroom leader. *Id.* ¶ 48.  He asserts that his position was specifically targeted by Defendant under the Policy. *Id.*  Plaintiff Bradley was terminated from the Democrat and Chronicle – a Defendant publication – after 21 years. *Id.* ¶ 49.  Plaintiff Bradley asserts that, when he was terminated, the Democrat and Chronicle's Executive Editor stated that he "decided

---

[7] Plaintiffs do not allege facts from which one could determine upon what Plaintiffs base their belief regarding this caste system.  The Policy references no such explicit preference system. Dkt. 41-4.

[8] The Court presumes that this second category is meant to include persons who applied for positions with Defendant but were not ultimately hired (or offered a contract), but Plaintiffs' phrasing is unnecessarily confusing.

to terminate Mr. Bradley's employment rather than another worker, Mark Liu, because Mr. Liu was Asian and Mr. Bradley was White." *Id.* ¶ 50. At the same time, another White member of the sports writing staff was terminated after working for Defendant for 37 years. *Id.* ¶ 51.

Defendant asserts that, as part of his termination, Plaintiff Bradley signed a Separation Agreement and Release of Claims (the "Bradley Agreement"). Dkt. 33-2. As part of the Bradley Agreement, Defendant asserts that Plaintiff Bradley accepted $36,324.88 and released "any and all legal claims, or causes of actions, you may have, or think you have, against Gannett and any of its directors, officers, and employees," including claims "under Title VII of the Civil Rights Act of 1964." *Id.*

In January 2021, Plaintiff Bradley submitted an application for the open position of executive editor of Defendant's Mohawk Valley operations, which included the Utica Observer-Dispatch. Dkt. 28 ¶ 53. After submitting his application and participating in at least three interviews, Plaintiff Bradley was informed that Defendant was seriously considering him for the position and that he was one of two finalists, where the other finalist was also a White male. *Id.* ¶ 54. Plaintiff Bradley had previously served as a sports editor and a content strategist, where he had supervised other employees and had received several awards. *Id.* ¶¶ 57-59. In March 2021, Plaintiff Bradley was informed that a new candidate had emerged and was selected for the position. *Id.* ¶ 55. That candidate was Sheila Rayam, a Black woman. *Id.* Ms. Rayam had previously held positions as a reporter and as a community engagement editor. *Id.* ¶ 56. Ms. Rayam was the first Black executive editor for Defendant's Mohawk Valley operations. *Id.* ¶ 60.

<u>Stephen Crane</u>

Plaintiff Crane worked for Defendant from 2019 to 2021. *Id.* ¶ 11. In March 2020, Katrice Hardy – a Black woman – was hired to serve as executive editor of The Indianapolis Star, which

entailed overseeing more than two dozen newsrooms throughout Indiana, Illinois, and Kentucky. *Id*. ¶ 66.  While serving as editor,[9] Plaintiff Crane asserts that he was forced to rescind an offer made to a White male applicant.  *Id*. ¶ 68.  Ms. Hardy gave Plaintiff Crane a biased performance review based on Plaintiff Crane's failure to follow "race-based editorial directives."  *Id*. ¶ 69.[10] Rather than relay the negative performance review to Plaintiff Crane herself, Ms. Hardy directed Cynthia Adams to provide Plaintiff Crane with his review.  *Id*.  Plaintiff Crane objected to the evaluation and filed a complaint with human resources ("HR") regarding the review.  *Id*.  HR supported Ms. Hardy's performance review; accordingly, Plaintiff Crane resigned.  *Id*.

<u>Noah Hiles</u>

Plaintiff Hiles worked for Defendant from 2021 to 2022 as sports reporter for the Beaver County Times. *Id*. ¶¶ 13, 73-74.  Plaintiff Hiles asserts that his hiring was delayed for two months, despite "local leaders"[11] expressing a desire to hire him immediately.  *Id*. ¶ 74.  Two months after being hired, the only other member of the Beaver County Times sports staff quit.  *Id*. ¶ 75.  This left Plaintiff Hiles as the *de facto* sports editor and resulted in his creation of a sports budget as well as delegating sports assignments to freelance reporters and photographers.  *Id*.  Despite taking on this additional work, Plaintiff Hiles was not promoted to sports editor.  *Id*. ¶ 76.  Plaintiff Hiles asserts that he attempted to assist in the hiring of other sports editors and that he was instructed to assist in finding minorities to fill those positions.  *Id*. ¶ 78.  Two African-American candidates

---

[9] Plaintiffs do not specifically identify Plaintiff Crane's position outside of calling him an "editor."

[10] It is far from clear what Plaintiffs meant in this regard, but the Court presumes that Plaintiffs intended to allege that Plaintiff Crane failed to follow directives that flowed from the Policy and therefore received a negative performance review.

[11] It is unclear what "local leaders" means in this context and whether Plaintiffs intend to assert that these individuals were part of the hiring committee.

were offered positions, but rejected them. *Id.* ¶ 79. Ultimately, Defendant hired Parth Upadhyaya, in part due to Plaintiff Hiles' outreach efforts. *Id.*

Although Mr. Upadhyaya was also hired as a sports reporter, Plaintiff Hiles learned Mr. Upadhyaya was being paid approximately 17% more than him. *Id.* ¶ 80. Plaintiff Hiles then asked for a raise. Plaintiff Hiles was informed that Defendant had to pay Mr. Upadhyaya a higher salary to ensure that he would accept the position. *Id.* ¶ 81. Plaintiff Hiles was then told that he would have to wait a year to be considered for a raise and that it would be based on his performance. *Id.*

<u>Barbara Augsdorfer</u>

Plaintiff Augsdorfer was a reporter with Defendant from 2020 to 2021. *Id.* ¶¶ 15, 86. In June 2020, roughly six months after Plaintiff Augsdorfer was hired at the Savannah Morning News, Rana L. Cash – a Black woman – was hired as the executive editor. *Id.* ¶ 88. As executive editor, Ms. Cash emphasized a need to hire more Black newsroom workers. *Id.* ¶ 89. From 2020 to 2022, the number of White workers at the Savannah Morning News decreased by 27.4 % and the number of Black workers increased by 18.2 %. *Id.* At some point in time, Ms. Augsdorfer's work assignment was transferred from covering education and nonprofits to covering two local counties, Bryan and Effingham Counties. *Id.* ¶ 90. Ms. Augsdorfer was informed that coverage of these counties was a necessity, even though Ms. Augsdorfer preferred continuing in her old position. *Id.* ¶ 91. Ms. Augsdorfer alleges that, after her coverage was transferred, a less experienced Black or African American worker was hired to cover education and non-profits. *Id.* ¶ 92. Later, Mrs. Augsdorfer was informed that her performance was not up to par, and she was placed on a performance plan before ultimately being terminated in November 2021. *Id.* ¶ 93. No one was hired to replace Ms. Augsdorfer with respect to covering Bryan and Effingham Counties. *Id.* ¶ 94.

<u>Logan Barry</u>

Plaintiff Barry worked for Defendant from 2019 to 2020 as a multimedia local government reporter for The Progress-Index.  *Id*.  ¶¶ 17, 95-96.  At some point in time, apparently prior to the merger with Defendant, management informed Plaintiff Barry that he was amongst the highest performers in the newsroom and that they intended for him to become a Team Lead in the future. *Id*. ¶ 97.  Later, a full-time Team Lead role was awarded to Leila Magee – a Black woman.  *Id*. ¶ 99.

### B.   Procedural Background

On August 18, 2023, Plaintiffs filed their Complaint.  Dkt. 1.  Before Defendants had an opportunity to respond to the Complaint, Plaintiffs filed a Motion to Stay Issuance of a Rule 16 Order and Bifurcate this Matter into Three Phases.  Dkt. 8.  On November 24, 2023, Defendant filed a Motion to Dismiss the Complaint.  Dkt. 17.  Defendant also opposed Plaintiff's Motion. Dkt. 20.  On November 27, 2024, Magistrate Judge Fitzpatrick denied Plaintiff's Motion as premature.  Dkt. 22.

On December 15, 2023, Plaintiffs filed an Amended Complaint asserting one count, on behalf of all class members, of race discrimination pursuant to 42 U.S.C. § 1981.  Dkt. 28. Defendant's first motion to dismiss was subsequently denied as moot.  Dkt. 29.

On January 8, 2024, Defendant filed the instant Motion to Dismiss/Strike Class Allegations.  Dkt. 33.  On January 22, 2024, Plaintiffs filed their Opposition.  Dkt. 36.  On January 29, 2024, Defendant filed its Reply.  Dkt. 37.

On February 8, 2024, Plaintiffs filed a Motion to Certify Class and a Motion for a Preliminary Injunction.  Dkt. Nos. 38; 40.  Defendant subsequently filed a Motion to Stay briefing

of those motions due to the pending Motion to Dismiss.  Dkt. 44.  That Motion was granted; therefore, briefing has not been completed on those motions.  Dkt. 49.

On March 20, 2024, Defendant filed a Notice of Supplemental Authority.  Dkt. 50.

## II.   STANDARD OF REVIEW

### A.  Rule 12(b)(6)

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion.  *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

B.  Striking Class Allegations !

A "court may strike from a pleading" class allegations "on motion made by a party" or "require that the pleadings be amended to eliminate" the class allegations. Fed. R. Civ. P. 12(f)(2); 23(d)(1)(D).  A court should do so before discovery only "if the allegations are facially and inherently deficient." *Knapp v. Zoetis Inc.*, No. 3:20-cv-191, 2021 WL 1225970, at *10 (E.D. Va. March 31, 2021).

## III. ANALYSIS

Plaintiffs assert a single cause of action pursuant to 42 U.S.C. § 1981 on behalf of all named Plaintiffs and all Proposed Class Members.  Dkt. 28 at 20.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a). Courts have recognized that "Title VII and § 1981 apply to 'reverse discrimination' cases in which, as here, a member of the white majority alleges that [he or] she suffered adverse employment action on account of . . . race."  *Wethje v. CACI-ISS, Inc.*, 2021 WL 718939, at *4 (D. Md. Feb. 24, 2021).

The Court has traditionally applied the *McDonnell Douglas*[12] framework to § 1981 claims where direct evidence of discrimination is lacking.  *See Guessous v. Fairview Prop. Investments, LLC,* 828 F.3d 208, 216 (4th Cir. 2016); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001).  As recently reiterated by the Fourth Circuit in the context of a § 1981 claim, more is required to survive a motion to dismiss than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022).  Moreover, the Supreme Court has recently clarified that to prove discrimination under § 1981 a plaintiff must prove that

---

[12] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"but for race, [he or she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020).   Thus, applying *Comcast*, courts within this Circuit have held that allegations that race "may have played some role or even been a motivating factor," do not plausibly allege a Section 1981 claim.   *Nadendla v. WakeMed*, 2021 WL 1056521, at *2 (E.D.N.C. Feb. 23, 2021).

## A.  Allegations Regarding a Policy

Plaintiffs first seek to defend against the Motion to Dismiss by arguing that the Policy establishes race discrimination.   Although the affidavit that Plaintiffs' counsel attached to the Opposition suggests that the Inclusion Report is itself "the Policy," this is far from clear from the Amended Complaint, which refers to "the Policy" and the "2020 Inclusion Report" separately. *Compare* Sanderson Aff. ¶ 25 (Dkt. 36-1) (relying on the 2020 Inclusion Report as the Policy) *with* Dkt. 28 ¶¶ 21-22 (describing the Policy and the 2020 Inclusion Report separately).   The 2020 Inclusion Report is vague and aspirational as to Defendant's goals and does not: (i) define specific quotas for any specific position or the workforce overall; (ii) refer to any caste system designating a hierarchical preference for certain racial groups over others; or (iii) provide specific plans for how its diversity goals are to be achieved.   Dkt. 41-4.   Indeed, the 2020 Inclusion Report does not define any specific goals other than an aspiration to "[a]chieve racial and gender parity with the diversity of our nation, throughout our workforce" and it says that Defendant will hold leadership accountable to meet unidentified objectives to be set during an unspecified "annual goal setting process."  *Id*.   Moreover, the 2020 Inclusion Report purports to embrace "[f]air treatment for all" and making sure that everyone "has equal opportunities to thrive."  *Id*. at 4, 16.

To the extent that the 2020 Inclusion Report *is* the Policy,[13] courts have recognized that "the mere existence of a diversity policy, without more," is insufficient to make out a *prima facie* case of discrimination. *Weinerth v. Talley*, 2018 WL 2729205, at *4 (W.D. Va. June 6, 2018) (recognizing that a "goal of increasing diversity" is "legitimate and lawful"); *Jones v. Bernanke*, 493 F.Supp.2d 18, 29 (D.D.C. 2007); *Reed v. Agilent Techs., Inc.*, 174 F.Supp.2d 176, 185-86 (D. Del. 2001) ("Merely producing anecdotal evidence regarding the aspirational purpose of an employer's diversity policy, and its intent to ameliorate any underutilization of certain groups, is not sufficient.").[14]  Moreover, the Inclusion Report does not call for any particular action nor does it call for the consideration of race to the exclusion of all other factors.  Dkt. 41-4.  Because the Court determines that the Policy alone (however it is defined) does not establish disparate treatment, the Court must analyze (as the parties do) the circumstances of each individual named Plaintiff as well as the Proposed Class.

## B.  Claims as to Each Named Plaintiff

Defendant argues that each of the named Plaintiffs has failed to state a claim for relief under § 1981.  Dkt. 34.  Accordingly, the Court analyzes the allegations of each individual Plaintiff.

### i.  Steven Bradley

Plaintiff Bradley bases his § 1981 claim on two allegations: (i) his termination; and (ii) the failure to hire him as an executive editor.  With respect to the first termination claim, Defendant

---

[13] To the extent that the 2020 Inclusion Report *is not* the Policy, Plaintiffs have failed to identify any details regarding the specifics of the Policy.

[14] *Cf. Coalition for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 884 (4th Cir. 2023) (finding that statements by school board members regarding intent to strike "racial balance" reveal "at most . . . aspirations to improve student diversity" in finding no equal protection violation).

argues that Plaintiff Bradley has waived his right to pursue that claim in a Separation Agreement (Dkt. 33-2).  The Separation Agreement provides that Plaintiff Bradley releases "any and all legal claims, or causes of action, you may have, or you think you have, against Gannett," including any claims that "arose at any time before or at the time you sign this agreement" and claims under "federal, state, and local employment laws."  Dkt. 33-2 ¶ 2(a)-(b).  Plaintiff Bradley signed the Separation Agreement on his Separation Date – May 1, 2020.  *Id*. at 9.  The Separation Agreement precludes Plaintiff Bradley's claims to the extent that they rely on his termination, which was communicated to Plaintiff Bradley well before he signed the Separation Agreement, and which became effective on the same day that he signed that document.

To begin with, Plaintiff Bradley argues that the Court cannot consider the Separation Agreement because it is not incorporated into the Amended Complaint.  Not so.  In cases where a plaintiff alleges discriminatory discharge, courts have held that "the Separation Agreement is integral to the Complaint because it sets forth the terms of plaintiff's termination that forms the basis for claims of discrimination."  *McGuire v. Lord Corp.*, 2019 WL 4858859, at *2 (E.D.N.C. Sept. 30, 2019).[15]  Plaintiff Bradley next argues that he signed the Separation Agreement *before* he was terminated, thus rendering the release contained therein inapplicable to his claims here.

---

[15] *See also Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1109 (N.D. Cal. 2003) (holding that "documents crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents on which their claims are based"); *Advanced Cleanup Techs., Inc. v. BP Am. Inc.*, 2015 WL 13841820, at *2 n. 2 (C.D. Cal. Oct. 9, 2015) ("A well-established application of [the incorporation by reference] doctrine is a settlement agreement that, if valid, would bar claims alleged by the plaintiff in his or her complaint."); *Stefanyshyn v. Shafer Contracting Co., Inc.*, 2005 WL 1277806, at *1 (D. Minn. May 26, 2005) (same); *See In re Refco Inc. Secs. Litig.*, 2012 WL 4053939, at *2 (S.D.N.Y. Aug. 8, 2012), *report and recommendation adopted*, 2012 WL 4009175 (S.D.N.Y. Sept. 12, 2012) (holding that, if a "Settlement Agreement would dispose of this matter (that is, if it is an agreement entered into in good faith) it makes no sense to deny dismissal simply because it was not referenced in the Complaint").

Dkt. 36.  This argument is nonsensical.  Plaintiff Bradley was informed of the decision to terminate him on the initial date of the agreement – April 24, 2020 – and signed the Separation Agreement on the same day that the termination took effect – May 1, 2020.  Dkt. 33-2; *see Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (holding that § 1981 cause of action accrues when an employee is informed of a termination decision, not when the termination later becomes effective).  Thus, the termination decision was made and communicated to Plaintiff Bradley well before he signed the Separation Agreement, and his claims based on this termination would therefore be covered.  *See* Dkt. 33-2 (release covers "claims that arose at any time before or at the time you sign this agreement").[16]  Accordingly, pursuant to the Separation Agreement, Plaintiff Bradley has released any claims related to his termination and cannot proceed based upon his termination here.

---

[16] Plaintiff also argues that the Separation Agreement (signed in New York) never took effect – despite Plaintiff Bradley's signature and apparent receipt of the funds described therein – because there is a reference on the first page to the Separation Agreement taking effect "upon your signature after your Separation Date."  Dkt. 33-2.  While the Court agrees that the inclusion of the word "after" may be inartful, the word is ultimately immaterial and not a basis to invalidate the Separation Agreement.  *See Lobo & Co. v. Plymouth Nav. Co. of Monrovia*, 187 F. Supp. 859, 860-61 (S.D.N.Y. 1960) (refusing to not apply an arbitration clause despite deadline in agreement because, "[w]here a delay of one day . . . has occurred in the case of parties who are in continual communication, such a delay is an immaterial variation of the terms of the contract and should not be permitted to upset the basic and original intent"); *Sacks v. McNamara Buick-Pontiac, Inc.*, 226 N.Y.S.2d 34, 36 (1962) (holding that "the fact that defendant corporation did not have an officer actually sign the memorandum (as required by its terms), which argument formed the basis of the second affirmative defense, has no merit" because "the endorsement and collection of the check" was enough) *cf. Burns v. Orthotek, Inc. Emps.' Pension Plan & Trust*, 657 F.3d 571, 576 (7th Cir. 2011) (noting that, arguably compliance "literal language" would "lead to the absurd result of invalidating [an agreement] that the [signing party] admits that he signed but now attempts to disavow on [a] technicality").  Particularly on point is an older New York contract decision, in which a party argued that a writing was invalid where the writing was signed "by the respondent on the same day as that on which the contract of exchange was signed and by the terms of which the respondent agreed to wait for his commissions until title closed."  *Hough v. Baldwin*, 99 N.Y.S. 545, 548 (1906).  That court held, "[w]hether it was signed before or after the signing of the contract of exchange is immaterial in view of the appellant's admission that all terms of the written contract of exchange were fully agreed upon on the proceeding day."  *Id.*  Here, it is clear that Plaintiff Bradley signed the Separation Agreement on his Separation Date, and whether that, as a

To the extent that Plaintiff Bradley bases his claim on Defendant's failure to hire him as executive editor, that claim also fails. Plaintiff Bradley's allegations in support of his failure-to-hire claim essentially boil down to the following facts: (i) Defendant sought out Ms. Rayam; (ii) Plaintiff Bradley had significant awards; and (iii) Plaintiff Bradley had been employed by Defendant for a long time. Dkt. 28 ¶¶ 56-58. But that Plaintiff Bradley subjectively viewed himself as more qualified is not enough to push his claims of discrimination across the line from possible to plausible. *See McCleary-Evans v. Md. Dept. of Transp., State Hwy. Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (holding that plaintiff "can only speculate that the persons hired were not better qualified, or did not perform better in the interview, or were not better suited based on experience and personality for the positions"); *McCaskey v. Henry*, 2012 WL 1118851, at *3 (W.D.N.C. Apr. 3, 2012) (finding the plaintiff's allegations that she was "dependable, loyal, talented, strong, and creative" and had the requisite "experience, qualifications and readiness to be promoted" conclusory and insufficient to state a claim and emphasizing that "[a] plaintiff's mere assertion of general qualifications is not enough without some reference to an objective standard").[17] Moreover, Plaintiffs do not allege that Ms. Rayam was *not qualified*; rather they

---

technical matter, was before or after he concluded work such that his signature was obtained "after" the Separation Date is immaterial to the substance of the agreement.

[17] The allegations in the Amended Complaint do not establish facts from which the Court could determine that Plaintiff Bradley was more qualified for an executive editor position. Indeed, the Amended Complaint noticeably omits any allegations regarding Ms. Rayam's qualifications, other than the fact that both Plaintiff Bradley and Ms. Rayam had previously been editors. *See* Dkt. 28 ¶¶ 56-57 (alleging Plaintiff Bradley had been a sports editor and Ms. Rayam was a community engagement editor). But Plaintiffs do cite and link a news article about Ms. Rayam's hiring. *See Nabors v. Lewis*, 2018 WL 7118008, at *3 (D.S.C. Feb. 16, 2018) (holding that, "by linking the articles to the amended complaint, the plaintiff has, in essence attached the articles as exhibits to her amended complaint"). According to that article, Ms. Rayam: (i) had been with the Democrat and Chronicle since 1990; (ii) had led the opinions section; (iii) had guided the mobile newsroom strategy; (iv) was a leader and key presenter in a working group regarding public safety; and (v) had roles at the company that included reporter, copy editor, site manager for a women's

simply allege that Plaintiff Bradley was more qualified. *See Amis v. Pekoske*, 2021 WL 783543, at *3 (W.D.N.C. Mar. 1, 2021) ("Plaintiff makes no allegations that Ms. Gallagher did not meet the GS-14 or private sector qualifications; rather, he simply alleges that he was 'significantly more qualified . . . .' This is nothing more than speculation that Ms. Gallagher was 'not better qualified' than Plaintiff."). To the extent that Plaintiffs allege that Defendant preselected and sought out Ms. Rayam, those allegations also fail to establish a plausible allegation of race discrimination pursuant to § 1981. *See Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 271 (4th Cir.2005); *Jackson v. Winter,* 497 F.Supp.2d 759, 770 (4th Cir.2007) ("Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination."). Instead, each of Plaintiff Bradley's allegations seeking to tie his non-selection to his race are vague and conclusory. *See, e.g.*, Dkt. 28 ¶ 56 (alleging "she was selected over Mr. Bradley on the basis of his race"); *id*. ¶ 63 (alleging that, "[b]ecause of the Reverse Race Discrimination Policy, Gannett chose not to hire Mr. Bradley on the basis of his race"). But Plaintiff Bradley fails to make any connection between the Policy or 2020 Inclusion Report (which does not specifically encourage racism of any kind) and the decision-makers with respect to the executive editor position for which he applied.

---

news site called herrochester.com, entertainment editor, social media editor and most recently community engagement editor and opinion editor. Dkt. 28 n.5; *Sheila Rayam to lead Gannett's Mohawk Valley newsrooms*, UTICA OBSERVER-DISPATCH, (March 22, 2021), *available at* https://www.uticaod.com/story/news/2021/03/22/sheila-rayam-editor-utica-observer-dispatch-herkimer-times-telegram/4798569001/.

Accordingly, Plaintiff Bradley has failed to state a claim for a violation of § 1981 because: (i) his termination claim was released under the Separation Agreement;[18] and (ii) he has failed to plausibly allege that race was the but-for cause of his non-selection.

### ii.      Stephen Crane

Plaintiff Crane's § 1981 claim differs from Plaintiff Bradley's in that it is based on: (i) his alleged constructive discharge; and (ii) an alleged retaliatory performance review.[19]   To state a claim based on his discharge, Plaintiff Crane must first allege facts sufficient to show that he was constructively discharged given that he resigned from his position.  Dkt. 28 ¶ 71 ("Mr. Crane felt he had no other choice than to resign").  A plaintiff may establish a constructive discharge by showing that his employer "deliberately made [his] working conditions intolerable in an effort to induce [him] to quit."  *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006).  But, as the Fourth Circuit has noted, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to

---

[18] To the extent Plaintiffs rely on any other validity issues with respect to the Separation Agreement, Plaintiffs have not raised them.  Nor do Plaintiffs identify any context that would assist the Court in determining the validity of the Separation Agreement.  Dkt. 36 at 19 (failing to identify "context" that would assist the Court).   Defendant submitted the Separation through the Declaration of Michelle Ferguson, who declared under penalty of perjury that the Separation Agreement was in the form ordinarily used by Defendant and kept in former employee personnel records as part of the ordinary course of business.  Dkt. 33-2.  Although Plaintiffs also attach an affidavit to their Opposition, that affidavit does not address the Separation Agreement.  Dkt. 36-1.

[19] To the extent Plaintiff Crane relies on other allegations regarding the hiring of other employees or the articles that he was assigned to write, those do not qualify as adverse employment actions.  *See, White v. City of Annapolis*, 2015 WL 5009853, at *8 (D. Md. Aug. 21, 2015) (holding that "dissatisfaction with work assignments" does not rise to the level of an adverse employment action); *Barnes v. City of Norfolk*, 2020 WL 13689491, at * & n. 3  (E.D. Va. Feb. 10, 2020) (holding that "allegedly race-based work assignments," fail "to meet the standard of an adverse employment action"); *see also Lebow v. Meredith Corp.*, 484 F. Supp. 2d 1201, 1214 (D. Kansas 2007) (holding that change in broadcast assignments not an adverse employment action); *Harapeti v. CBS Television Stations, Inc.*, 2022 WL 1274049, at *8 (S.D. Fla. Mar. 1, 2022) (holding that decision whether to staff reporter to Parkland Shooting story does not constitute an adverse employment action).

compel a reasonable person to resign." *Id*. Plaintiff Crane's allegations here fall within the category of conditions that the Fourth Circuit in *Heiko* and other courts applying that decision have held do not qualify as a constructive discharge. In the Amended Complaint, Plaintiff Crane points to only two actions by Defendant that caused him to resign: (i) being forced to rescind a job offer to a White male candidate; and (ii) receiving a negative performance evaluation. Dkt. 28 ¶¶ 68-69. These sparse allegations are not sufficient to establish an intolerable working environment such that Plaintiff Crane was constructively discharged. *See, e.g.*, *Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 F. App'x 690, 692-93 (4th Cir. 2020) (finding insufficient allegations of constructive discharge where the plaintiff relied on "discipline, social ostracization, and assignment to less favorable working conditions"); *Brown v. Baltimore Police Dep't*, 2011 WL 6415366, at *10 (D. Md. Dec. 21, 2011) (finding insufficient allegations that a plaintiff "was neglected by Defendants . . . , that he received a poor performance review, that his opportunity to choose his shifts were limited, and that his overtime shifts were consistently denied").[20]

To the extent that Plaintiff Crane alleges that he was retaliated against through his negative performance review, Plaintiff Crane has failed to establish that his performance review was a materially adverse action. "Courts in this Circuit have rejected retaliation claims based on poor or poorer performance reviews." *Hamilton v. Prince George's Cnty., Md.*, 2019 WL 4735429, at *4-5 (D. Md. Sept. 27, 2019) (citing cases); *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va.

---

[20] In their Opposition, Plaintiffs attempt to add allegations in support of Plaintiff Crane's claims. But it is well-settled law that a complaint may not be amended in opposition to a motion to dismiss. *See, e.g.*, *McDonald v. LG Electronics USA, Inc.*, 219 F. Supp. 3d 533, 541 (D. Md. 2016); *Arnett v. Hodges Law Offices, PLLC*, 2019 WL 4195343, at *4 n. 13 (E.D. Va. Sept. 4, 2019). Moreover, the allegations included in the Opposition would not alter the analysis here as they do not move Plaintiff Crane's claim of constructive discharge beyond his dissatisfaction with his work assignments and with his performance review. Dkt. 36 at 22-23.

2017) ("A negative performance review, alone, or a placement on a PIP alone, does not constitute a materially adverse action.");[21] *Tang v. Eastern Va. Med. Sch.*, 2022 WL 981942, at *8 (E.D. Va. Mar. 30, 2022) (holding that "Plaintiff's negative performance review does not constitute a materially adverse action").  Plaintiff Crane has not alleged that he suffered any consequences as a result of his negative performance review or that it produced any injury to his employment.[22]

Accordingly, Plaintiff Crane has failed to state a claim under § 1981 because he has not alleged facts that plausibly allege that he was constructively discharged or that he faced a materially adverse action that constituted retaliation.

### iii.   Noah Hiles

Plaintiff Hiles raises a separate theory of a § 1981 claim from Plaintiffs Bradley and Crane, in that he alleges that he was paid less than a similarly situated comparator who was not White. But Plaintiff fails to allege that Mr. Upadhyaya was similarly situated in all respects to Plaintiff.

---

[21] Plaintiffs also cite the *Emami* decision.  Dkt. 16.  Although Plaintiffs correctly cite *Emami* for the proposition that "there is no authority in the Fourth Circuit that holds that a PIP cannot be a materially adverse action," that does not support the assertion that there was a materially adverse action *here*.  To begin with, Plaintiff Crane does not allege that he was placed on a performance improvement plan.  Moreover, as the *Emami* Court recognized, a "negative performance review, *alone*, or a placement on a PIP *alone*, does not constitute a materially adverse action."  241 F. Supp. 3d at 685 (emphasis added).  In *Emami*, the district court held that there was a materially adverse action because "the Plaintiff's PIP was actually implemented, and it imposed conditions with which his failure to comply ultimately led to termination of employment."  *Id*. Those transformative facts are not present here.

[22] Again, seeking to impermissibly amend the Amended Complaint through the Opposition, Plaintiffs speculate that the negative performance review *might have* led to consequences for Plaintiff Crane, essentially arguing that Plaintiff Crane did not want to risk it. Dkt. 36 at 14-15.  But such amendment through a brief is impermissible.  *Arnett*, 2019 WL 4195343, at *4 n. 13.  In any event, such speculative assertions cannot support a claim based on the negative performance review.  *See Sparenberg v. Eagle Alliance*, 2015 WL 6122809, at *9 (D. Md. Oct. 15, 2015) ("To show that a negative performance review is an adverse employment action, a plaintiff must show 'real, rather than speculative, employment injury.'  Here, Sparenberg fails to show the negative performance review led to any further consequences . . . .").

*See Cosby v. S.C. Probation, Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (reiterating that comparators must be "similarly situated *in all respects*" in that they "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it" (emphasis original)).

Courts have recognized that employees are not similarly situated for purposes of pay discrimination where they were "hired . . . at different times." *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 285 (5th Cir. 2015); *Minnis v. Bd. of Sup'rs of La. State Univ. & Ag. & Mech. College*, 55 F. Supp. 3d 864, 880-83 (M.D. La. 2014) (holding no pay discrimination where employees were "hired at different times" and the employer had to make adjustments to pay based on different circumstances). Plaintiff was hired well before Mr. Upadhyaya. Dkt. 28 ¶ 79. Indeed, Plaintiff Hiles here, far from pleading facts which raise a plausible allegation that race was the but-for reason for the pay disparity, has pleaded just the opposite. Plaintiff Hiles has pleaded that Mr. Upadhyaya received a higher salary to ensure that he would accept the position, after two prior applicants declined the position, and that Plaintiff Hiles did not receive a raise when he first sought one because raises were evaluated at the end of the year based on performance. Dkt. 28 ¶¶ 80-81. Moreover, Plaintiff Hiles pleads that, when Defendant conducted its review, he did receive a raise – but fails to allege the scope of the raise such that the Court cannot even analyze what discrepancy in pay may have existed. *Id*. ¶ 83 (alleging that Plaintiff Hiles received an unspecified raise). Accordingly, Plaintiff Hiles has failed to plead facts that plausibly allege a race-based pay disparity sufficient to state a claim under § 1981.

iv.     *Barbara Augsdorfer*

Plaintiff Augsdorfer again introduces a new theory of recovery for her § 1981 claim based on her reassignment, and she also relies on her termination.  Dkt. 28 ¶ 94.  Plaintiff Augsdorfer has not alleged facts demonstrating that her change in assignment constitutes an adverse employment action.  *See James v. Booz-Allen & Hamilton, Inc*., 368 F.3d 371, 377 (4th Cir. 2004) ("The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action."); *see also Lebow v. Meredith Corp.*, 484 F. Supp. 2d 1201, 1214 (D. Kansas 2007) (holding that change in broadcast assignments was not an adverse employment action); *cf. Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1082 (3d Cir. 1992) (holding that "employment status was virtually unchanged" where plaintiff was "reassigned from the 'courthouse beat' to a 'demeaning' general reporting assignment" where the reassignment "would have involved no loss of pay or change in title").  Thus, Plaintiff Augsdorger cannot premise her § 1981 claim on her beat reassignment.

With respect to Plaintiff Augsdorfer's termination claim, plaintiffs are required to plead that they are satisfactorily performing their job and that they were treated differently from a similarly situated comparator or otherwise terminated in circumstances giving rise to an inference of discrimination.  *See Spellman v. Sch. Bd. of City of Chesapeake, Va.*, 2018 WL 2085276, at *5 (E.D. Va. Apr. 5, 2018).  Here, Plaintiff Augsdorfer does not plead that she was satisfactorily performing her job at the time of her discharge; rather, Plaintiff Augsdorfer pleads that she had been informed that "her performance was not up to par" and that she was "placed on a performance plan."  Dkt. 28 ¶ 93; *see also Edouard v. John S. Conner, Inc.*, 2023 WL 3127622, at *5 (E.D. Va. Apr. 27, 2023) (dismissing discrimination claim where "the Complaint is devoid of factual assertions that would allow the Court reasonably to infer that Plaintiff's job performance was

satisfactory at the time of her termination"). Nor has Plaintiff Augsdorfer pleaded facts from which it could be inferred that race discrimination was the but-for cause of her termination. Plaintiff Augsdorfer has not pleaded: (i) that she was treated differently from a similarly situated comparator; (ii) that she was replaced on her two-county beat by a person outside of her protected class; or (iii) any allegations that would support an inference of discrimination. Rather, Plaintiff Augsdorfer speculates as to Defendant's motives. Dkt. 28 ¶ 94 (alleging in conclusory fashion that transfer and termination were a "creative ploy to fulfill the Reverse Race Discrimination Policy"); *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 191 (4th Cir. 2010) (holding "the complaint's allegation of race discrimination do not rise above speculative levels"). Accordingly, Plaintiff Augsdorfer has failed to state a plausible claim of race discrimination under § 1981.

*v.     Logan Barry*

Plaintiff Barry alleges a final new theory of § 1981: a failure to promote claim. Neither party adequately grapples with what a plaintiff is required to plead to state a claim for failure to promote where there was no opportunity to apply for the position. Importantly, Plaintiff Barry does not allege that, had the position for Team Lead been posted, he would have applied for it. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 432 (4th Cir. 2004) ("Williams cannot be treated as if she had applied for those promotions unless she can show that she would have applied had she known about them."). That defect is, of course, easily remedied through an amendment. Plaintiff Barry must also allege facts demonstrating that he was not promoted in circumstances giving rise to an inference of discrimination. To the extent that Plaintiff Barry relies on allegations that he was more qualified than the person chosen, Plaintiff Barry has failed to plead any facts to support that Ms. Magee was less qualified. *See* Dkt. 28 ¶¶ 99-100 (alleging no facts regarding Ms. Magee's qualifications); *see also McCleary-Evans,* 780 F.3d at 586; *McCaskey*, 2012 WL

22

1118851, at *3 (finding the plaintiff's allegations that she was "dependable, loyal, talented, strong, and creative" and had the requisite "experience, qualifications and readiness to be promoted" conclusory and insufficient to state a claim and emphasizing that "[a] plaintiff's mere assertion of general qualifications is not enough without some reference to an objective standard"); *Amis*, 2021 WL 783543, at *3 ("Plaintiff makes no allegations that Ms. Gallagher did not meet the GS-14 or private sector qualifications; rather, he simply alleges that he was 'significantly more qualified . . . .' This is nothing more than speculation that Ms. Gallagher was 'not better qualified' than Plaintiff."). Thus, Plaintiff Barry also fails to state a claim of discrimination pursuant to § 1981.

*     *     *

In sum, each of the named Plaintiffs has failed to state a claim for relief pursuant to § 1981. Accordingly, the Motion to Dismiss will be granted in this regard.

### B. Class Claims

Defendant next seeks to dismiss the class allegations. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, one or more putative class members may sue as representatives of the class if they satisfy the following threshold requirements: (i) numerosity; (ii) commonality; (iii) typicality; (iv) adequacy of representation; and (v) ascertainability. *See Peters v. Aetna, Inc.*, 2 F.4th 199, 241-42 (4th Cir. 2021) (citing Fed. R. Civ. P. 23(a)). Once these threshold requirements are met, putative class members must also satisfy Rule 23(b) by showing that either: (a) individual actions would risk inconsistent or non-dispositive judgments, (b) that they are seeking class-wide injunctive or declaratory relief, or (c) that there are common legal or factual questions that predominate over any other concerns affecting individual members. *Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (citing Fed. R. Civ. P. 23(b)).

The Supreme Court has made clear that it is "quite obvious[]" that "the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can be productively litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Fourth Circuit has also cautioned that, "[i]n a very broad and loose sense, any member of any [protected] class who [allegedly] suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but clear that is not [a ground for class certification]." *Adams v. Bethlehem Steel Corp.*, 736 F.3d 992, 995 (4th Cir. 1984) (alterations in original) (citations omitted).

To begin with, Defendant correctly argues that the proposed class is not ascertainable. The Proposed Class consists of

> All individuals who were subject to defendant's [sic] Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) [sic] or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

Dkt. 28 ¶ 34. But by Plaintiffs' own allegations *every* employee was "subject to" the Policy. *Id.* ¶ 21 (alleging that the Policy was "company-wide"). Thus, the Proposed Class includes every employee who has worked for Defendant while the Policy was in place and every person who applied for a position with Defendant while the Policy was in place. But it is clear that Plaintiffs do not intend to plead that *every* person will have been adversely affected by the Policy; indeed, they plead the opposite. Pursuant to Plaintiffs' Proposed Class definition, Ms. Rayam, Ms. Magee, and Mr. Upadhyaya would all fall into the Class, but Plaintiffs surely do not intend to include them in the Class. *See, e.g.*, *id.* ¶ 56 (alleging Ms. Rayam, who would have been "subject to" the Policy as an employee, was a beneficiary of the Policy). Given Plaintiffs' Proposed Class definition, large swaths of potential class members would not even have a plausible cause of action because

24

they would not have suffered any adverse employment action.  Indeed, Plaintiffs recognize that their Proposed Class is not ascertainable and, in their Opposition, attempt to narrow their class definition.  Dkt. 36 at 24.  Thus, there is no way to "readily identify the class members in reference to objective criteria."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (holding that, "[w]here it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegations on the pleadings").

The Proposed Class also suffers deficiencies with respect to commonality.  As evidenced just by the named Plaintiffs, the Proposed Class seeks to bring claims based on at least five different legal theories: (i) discharge; (ii) constructive discharge; (iii) failure to promote; (iv) retaliation; and (v) pay disparity.  Each of these different legal theories involves a different application of a *prima facie* case under *McDonnell-Douglas*.  *See Albritton v. Norfolk Redevelopment & Housing Auth.*, 935 F.2d 1285 (4th Cir. 1991) (describing disparate treatment, retaliation, failure-to-promote, and wrongful discharge as separate theories).  Moreover, although Plaintiffs have alleged a company-wide policy, the Policy provides no specific instructions or mandate as to how it is to be enforced or accomplished.  Dkt. 41-4 (2020 Inclusion Report).  Thus, with respect to any individual employment decision, decision-makers are going to be exercising a high level of discretion.  Any resolution of these issues will necessarily require mini-trials focused on the particular theory of discrimination or retaliation that examines the specifics of the relevant position, the qualifications required, and the individual decision-maker.

As in the *Dukes* case, the Plaintiffs would all be seeking relief based on different theories of recovery, based on different positions at different newspapers in different areas of the country with different decision-makers.  *See* 564 U.S. at 359-60 (agreeing with Judge Kozinski that the

only things the plaintiffs have in common is "their sex and this lawsuit").  Indeed, Plaintiffs have even less in common than the *Dukes* plaintiffs, because, there, the plaintiffs were all the same sex. Here, the Proposed Class is not limited to White individuals, even though all the named Plaintiffs appear to be White, Plaintiffs appear to assert that White individuals are most damaged by the Policy, and Plaintiffs allege that there is a "caste system" of hierarchical preferences between minority employees with White individuals receiving the lowest or no preference.  *Comp.* Dkt. 28 ¶¶ 31, 51, 81 (alleging that Plaintiffs Bradley, Hiles, and Barry are White and that a "caste system" exists) *with* Dkt. 36 at 24 (asserting that the class would include all races "except for those who identify as Black or African American").  Here, Plaintiffs have failed to provide allegations overcoming the "wide gap" between an individual claiming that he or she was subject to a policy of discrimination, and the existence of a class of persons who have suffered the same injury, such that the claims share common questions of law or fact.  *Dukes*, 564 U.S. at 352-53; *see also Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 116 (4th Cir. 2013) (finding that plaintiffs failed to satisfy commonality where they did not allege that discretion was "exercised in a common way with some common direction").[23]

Given the lack of ascertainability of the Proposed Class and the critical questions that must be answered on an individualized basis, the Court concludes that it is appropriate to strike the class

---

[23] Plaintiffs suggest that these individualized proof problems could be addressed through a hearing pursuant to *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). But such a hearing is dependent on a showing that there was a "systemwide pattern or practice" of discrimination, which Plaintiffs have not alleged beyond conclusory and speculative allegations based on the aspirational 2020 Inclusion Report.  *Int'l Brotherhood of Teamsters*, 431 U.S. at 336. But the isolated incidents referenced here are insufficient to establish such a practice.  *See, e.g.*, *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 879 (1984) (implying that "two or three instances of discrimination" would not suffice for a Title VII pattern or practice claim).

allegations from the Amended Complaint.  *See Dukes*, 564 U.S. at 350 ("Dissimilarities within the proposed class" often "impede the generation of common answers.").

## IV. CONCLUSION

In sum, it is apparent that each of the named Plaintiffs' claims of discrimination must be dismissed for failure to state a claim and that the class allegations should be stricken from the Amended Complaint based on their failure to facially establish the ascertainability of the Proposed Class or the commonality of issues presented by the Proposed Class.  The Motion to Dismiss will therefore be granted in this regard.

The only outstanding issue is whether to grant leave to amend.  Generally, "[t]he determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825-26 (D. Md. 2013). Although Plaintiffs have previously amended their complaint in light of Defendant's original motion to dismiss, Plaintiffs have not previously had the benefit of the Court's analysis of their claims.  Accordingly, the Court will provide Plaintiffs with a final opportunity to file a complaint that is capable of stating a claim.

Accordingly, for the foregoing reasons, it is hereby ORDERED Defendant's Corrected Motion to Dismiss (Dkt. 33) is GRANTED IN PART and DENIED IN PART.  The motion is denied insofar as it seeks dismissal with prejudice, but the motion is granted in all other respects; and it is

FURTHER ORDERED that Defendant's original Motion to Dismiss (Dkt. 30) is DENIED AS MOOT; and it is

FURTHER ORDERED that the Amended Complaint (Dkt. 28) is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that the class allegations are STRICKEN from the Amended Complaint (Dkt. 28); and it is

FURTHER ORDERED that the Motion to Certify Class (Dkt. 38) is DENIED AS MOOT based upon the granting of the Motion to Dismiss; and it is

FURTHER ORDERED that the Motion for a Preliminary Injunction (Dkt. 40) is DENIED as MOOT based upon the granting of the Motion to Dismiss; and it is

FURTHER ORDERED that Plaintiffs are DIRECTED to file any second amended complaint within THIRTY (30) DAYS.

It is SO ORDERED.

Alexandria, Virginia
August 20, 2024

/s/
Rossie D. Alston, Jr.
United States District Judge