**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| **STEVEN BRADLEY, STEPHEN CRANE, NOAH HILES, BARBARA AUGSDORFER, AND LOGAN BARRY** *on behalf of themselves and all others similarly situated,*<br><br>             *Plaintiffs,*<br><br>   **v.**<br><br>  **GANNETT CO. INC.,**<br><br>             *Defendant.* | **SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br> **Civil Action No.: 1:23-cv-01100** |

Plaintiffs, Steven Bradley, Stephan Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry ("Named Plaintiffs"), individually and on behalf of other persons similarly situated (collectively "Plaintiffs" or "Class Members"), by and through their attorneys, bring this class action complaint against Gannett Co., Inc., ("Gannett" or "Defendant"), and allege as follows:

**NATURE OF ACTION**

1.      Named Plaintiffs bring this action on behalf of themselves and all others similarly situated against Defendant as a result of Defendant's implementation of policies that discriminated against Named Plaintiffs and Class members on the basis of their race.

2.      Plaintiffs are all individuals who were subject to Defendant's Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

3.      As the Supreme Court recently emphasized in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141, 2147 (2023), "[e]liminating racial discrimination means eliminating all of it."

1

4.     "One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000).

5.     This action seeks an injunction to seek an immediate end to Gannett's Reverse Race Discrimination Policy.

6.     In addition, this action seeks all other forms of legal and equitable relief available to redress the harms suffered by those individuals subject to Gannett's Reverse Race Discrimination Policy.

## JURISDICTION AND VENUE

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

8.     Venue is proper within the Eastern District of Virginia under 28 U.S.C. § 1391 as defendant is headquartered in this District.

## THE PARTIES

### Named Plaintiffs

9.     Named Plaintiff Steven Bradley worked for Gannett from 1999-2020 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Bradley and also governed any consideration Gannett would give to Mr. Bradley's prospective work for the company.

10.     Nonetheless, Mr. Bradley was subject to Gannett's Reverse Race Discrimination Policy.

11.     Named Plaintiff Stephen Crane worked for Gannett from 2019-2021 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Crane.

12.     Nonetheless, Mr. Crane was subject to Gannett's Reverse Race Discrimination Policy.

13. Named Plaintiff Noah Hiles worked for Gannett from 2021-2022 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Hiles and also governed any consideration Gannett would give to Mr. Hile's prospective work for the company.

14. Nonetheless, Mr. Hiles was subject to Gannett's Reverse Race Discrimination Policy.

15. Named Plaintiff Barbara Augsdorfer worked for Gannett from 2020-2021 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mrs. Augsdorfer.

16. Nonetheless, Mrs. Augsdorfer was subject to Gannett's Reverse Race Discrimination Policy.

17. Named Plaintiff Logan M. Barry worked for Gannett from 2019-2020 and thus 42 U.S.C. § 1981 governed Gannett's treatment of Mr. Barry and also governed any consideration Gannett would give to Mr. Barry's prospective work for the company.

18. Nonetheless, Mr. Barry was subject to Gannett's Reverse Race Discrimination Policy.

***Defendant***

19. Gannett is a Delaware corporation with its principal place of business located at 7950 Jones Branch Drive, McLean, Virginia 22107. Defendant is a mass media holding company and one of the largest newspaper publishers in the United States. Defendant owns USA Today, as well as numerous local newspapers throughout the nation, comprising the USA Today Network (collectively "Gannett Publications").

20. At all relevant times, the Class Members worked, applied for a position, and/or may apply for a position at Gannet; were and are thus entitled to protection from Gannett based on the relevant laws; and were and are harmed by being subject to Gannett's Reverse Race Discrimination Policy.

**FACTS**

21. Following the racial tensons that arose in this country in 2020 after the death of George Floyd, Gannett wanted to attract support by publicizing what it had done to institutionalize

and tighten a company-wide policy which was purportedly designed to achieve inclusion quotas, but practically speaking disadvantaged class members in terms of their work and/or prospective work for the company ("Reverse Race Discrimination Policy" or "RRDP"). Therefore, regardless of the actual applicant pool, Gannett committed that by 2025, that the staff demographics of all Gannett publications would reflect the racial and ethnic demographics in the community the newsroom covers, but not the demographics of the job applicant pool.

22.     Under the RRDP, Gannett imposed specific racial quotas in regard to employment. Under the RRDP, Gannett directed that in less than five years, managers were to make sure that in the newsroom, the percent of employees of each race matched the percentage of that race in the local community. For example, if Blacks comprised 20% of the local community, and a supervisor had 10 employees working for them, then that supervisor had to have two Black employees working for them.

23.     The RRDP's requirement that the Gannett employees' race had to match the race of the local community was neither aspirational nor vague. It was a set directive that was to be carried out over a set period of time with specific numerical goals that needed to be met by those Gannett employees making employment decisions.

24.     Nor was the RRDP a "diversity policy," which generally encourages the inclusion of all races in employment decisions. Instead, the RRDP was a specific plan that dictated that for at least the next five years employment decisions at Gannett would be done to ensure that the company's set numerical racial requirements in the workforce were met. The quality of the candidate's skills was not part of the RRDP's requirements.

25.     The RRDP's laser-like focus on race made race the decisive factor in employment decisions. It meant that the outcome of employment decisions would change if the race of the employees involved would change.

26.     The RRDP did not contain any requirement that employees be fairly treated by Gannett on the basis of their race. To the contrary it dictated that employees be treated differently based on their race. Gannett believed that "fair treatment" for its employees in the newsroom meant that the race of those employees had to match exactly the race of the potential readership of the paper, despite the fact that the racial makeup of the pool of potential employees did not match that of the potential readership of the paper.

27.     Aspects of the RRDP can be partially seen in the actions taken by Gannett and touched on in some of Gannett's written communications.

28.     Although it was not the RRDP itself, Gannett's 2020 Inclusion Report noted Gannett's goals through 2025 which included the goal to "[a]chieve racial and gender parity with the diversity of our nation, throughout our workforce."[1]

29.     This points to Gannett's commitment to hire and promote a certain percentage of individuals on the basis of their skin color and without regard to the relevant applicant pool.

30.     In order to reach the racial quotas by 2025, Gannett committed in the 2020 Inclusion Report to publishing detailed demographics of the racial composition of their workforce on an annual basis.[2]

31.     The 2020 Inclusion Report also represented that Gannett would hold their leadership accountable to meet this defined objective.

32.     Indeed, upon information and belief, Gannett leadership were entitled to certain bonuses and promotions, and given awards, incentivizing them to staff their newsroom's workforce with workers of racial and ethnic backgrounds to parity the racial demographics of the communities they serve regardless of racial and ethnic demographics of the applicant pool for each position.

---

[1]     *See* Gannett 2020 Inclusion Report, *available at* https://www.gannett.com/wp-content/uploads/2021/09/Gannett_2020_Inclusion_Report-1.pdf.

[2]     *See id.*

33. For example, an article published by a Gannett Publication, Democrat & Chronicle, on August 20, 2020, states that their goal "can accelerate most dramatically if the D&C hires more journalists of color."[3]

34. This article goes on to state that "[w]e have more hires in the works I'll tell you about later this year that will help us reflect better the full range of people who live in greater Rochester," and notes "[w]e need more Black front-line reporters. And we remain far short of the number of Latino reporters, photographers and editors we should have in a Monroe County with tens of thousands of Latino residents."[4]

35. Gannett moved forward with the implementation of the Reverse Race Discrimination Policy resulting in numerous highly qualified individuals finding their work relationship terminated or suffering other adverse actions based purely on their race.

36. Indeed, upon information and belief, the former Gannett employee that was tasked with overseeing talent recruitment and retention, Hollis Towns, informed Gannett managers that no more straight White males should be hired going forward.

37. In practice, implementation of the Reverse Race Discrimination Policy resulted in the treatment of different races differently. As stated above, Gannett wanted the percent of the races of its newsroom to match the percent of the races in its readership. Therefore, managers worked harder and gave better treatment to individuals from races that were more difficult to recruit than they did to races that were easier to recruit.

38. For example, statistically speaking, it was generally hardest to hire enough Black employees to meet the percentage of Blacks in the potential readership. That was due to the fact that

---

[3] See *From the editor: 'D&C' pledges to serve and reflect entire set of communities it serves*, DEMOCRAT AND CHRONICLE, (Aug. 20, 2020), *available at* https://www.democratandchronicle.com/story/news/2020/08/20/democrat-and-chronicle-editormakespledge-on-diversity-and-inclusion/5603997002/.

[4] *See id.*

generally the percentage of Black journalists in the applicant pool was so much lower than percent of Blacks in the potential readership. In order for managers to meet the racial requirements set by Gannett, Blacks were generally the most heavily recruited and most favorably treated by Gannett.

39.     Statistically speaking, it was next hardest for managers to match the percentage of Hispanics in the potential readership with the percentage of Hispanics in the newsroom. Again, this was caused by the discrepancy between the percentage of Hispanics in the applicant pool with the percentage of Hispanics among the potential readership. Although the difference was not as great as with Blacks, statistically speaking there was generally a much lower percentage of Hispanics in the applicant pool than there was in a paper's potential readership. Therefore, in order to hire and retain Hispanic employees, Gannett treated Hispanics more favorably than they would have if they were White or Asian and less favorably than if they were Black.

40.     Other than Whites, Asians were generally the easiest race to achieve a match between the percent employed and the percent in the potential readership. The percent of Asians in the applicant pool was closer to the percent Asians in the potential readership in comparison with Blacks and Hispanics. Therefore, although Gannett gave preferences to Asians over Whites in order to hire and retain Asians, that preferential treatment for Asians was less than that was given to Blacks and Hispanics.

41.     As to White employees, Gannett gave them less favorable treatment because, under the RRDP, Gannett wanted to reduce the White percentage of its workforce.

42.     Gannett executed their Reverse Race Discrimination Policy with a callous indifference towards civil rights laws or the welfare of the workers, and prospective workers, whose lives would be upended by it.

### CLASS ACTION ALLEGATIONS

43.     Named Plaintiffs and class members' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

44.     The Rule 23 Class consists of: all individuals who were subject to the defendant's Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

45.     Numerosity is satisfied as the Class size is believed to be over 40 members. For example, Gannett has over 100 brands employing newsroom members who were subject to the Reverse Race Discrimination Policy. Thus, the Class is so numerous that joinder of all Class Members is impracticable.

46.     Common issues of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. Among the common issues of law and fact are the following:

- Whether an injunction to end Gannett's Reverse Race Discrimination Policy is warranted;

- Whether Defendant subjected their workers to the policy described herein;

- Whether Defendant's Reverse Race Discrimination Policy amounts to discrimination or preferential treatment on the basis of race;

- Whether plaintiffs are entitled to declaratory relief that Defendants have violated 42 U.S.C. § 1981;

- Whether equitable remedies, compensatory damages, and punitive damages for the Class is warranted;

47.     Named Plaintiffs' claims are typical of the Class Members' claims because Named Plaintiffs, like other Class Members, were comparably injured through Defendant's wrongful conduct as described above.

48.     Further, Named Plaintiffs have no interest antagonistic to the Class, and have retained Harvey Law Offices, PLLC, and Thomas & Solomon LLP as counsel.

49.     Harvey Law Offices, PLLC and Thomas & Solomon LLP are qualified and able to litigate Named Plaintiffs' and Class Members' claims.

50.    Attorneys from Thomas & Solomon LLP have been admitted *pro hac vice* in this matter.

51.    Thomas & Solomon LLP concentrates its practice in litigation, and its attorneys are experienced in class action litigation.

52.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy and avoids duplication by allowing these claims to be prosecuted in a single action. Named Plaintiffs and Class Members lack the resources to adequately prosecute separate claims, and the amounts that each individual stands to recover makes individual cases impractical to pursue. Further, the costs for the court system for adjudication of individualized litigation would be substantial. The only practical chance for Class Members to obtain recourse is through a class action.

53.    The Class is maintainable under subsection (2) of Rule 23(b) because Defendant has acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive and other equitable relief in favor of the class as a whole.

54.    The Class is also maintainable under Rule 23(c)(4) because resolution of the common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

55.    Plaintiffs have standing to seek such relief because of the adverse effect that the Reverse Race Discrimination Policy had on them individually and employees and prospective employees generally. The injuries are redressable through systemic relief, such as an injunction, and other appropriate class-wide and individual remedies sought in this action.

56.    In addition, proper relief for Plaintiffs' claims can include reinstatement. As such, each has a personal interest in the Reverse Race Discrimination Policy implemented at Gannett moving forward.

57.    Failure to provide injunctive relief would expose Plaintiffs to the immediate threat of further discrimination as a result of the Reverse Race Discrimination Policy and the right to seek

employment free from discrimination from the one of the largest newspaper chains in the United States.

**<u>CLAIMS OF REPRESENTATIVE PLAINTIFFS</u>**

*Steve Bradley*

58.    As a content strategist and newsroom leader, Mr. Bradley occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

59.    Indeed, the implementation of this policy resulted in the termination of numerous well qualified workers based purely on their racial status, including Mr. Bradley, whose work relationship was terminated after working for the Democrat and Chronicle for 21 years.

60.    There can be no question that Mr. Bradley's termination was directly based on his race and resulted from the Reverse Race Discrimination Policy. For example, the Democrat and Chronicle's executive editor commented that he decided to terminate Mr. Bradley's employment rather than another worker, Mark Liu, because Mr. Liu was Asian and Mr. Bradley was White.

61.    As another example, simultaneously with Mr. Bradley's termination, a White member of the sports writing staff for approximately 37 years with Gannett Newspapers, including the Democrat and Chronicle, was also terminated solely on the basis of his racial status. No non-White members of the sports writing staff were terminated during this time period.

62.    To make matters worse, not only was Mr. Bradley illegally terminated from one position with the Democrat and Chronicle as a result of the Reverse Race Discrimination Policy, but he was also later rejected, solely on the basis of his race, from a position for different Gannett Publications for which he was undoubtedly qualified.

63.    In or around January 2021, Mr. Bradley submitted an application for the open position of executive editor of Gannett's Mohawk Valley operations, including the Utica Observer-Dispatch.

64.     After submitting his formal application and conducting at least 3 interviews, Mr. Bradley was informed that he was under serious consideration for the position and by February 2021, was informed that he was one of two finalists, the other finalist also being a White male.

65.     Thereafter, after the search and interview process for the executive editor position went dark for approximately one month, in mid-March 2021 Mr. Bradley was informed that a new candidate emerged and was selected for the position, who he later learned was Sheila Rayam.

66.     Ms. Rayam, a Black female, was selected for the position over Mr. Bradley as a result of Gannett's Reverse Race Discrimination Policy. Indeed, she was selected over Mr. Bradley on the basis of his race despite not having expressed interest or applying in the first instance, and despite having far less qualifications than Mr. Bradley, including little to no prior newsroom management or supervisory experience, having only previously held positions as a reporter and community engagement editor.

67.     In contrast to Ms. Rayam who had only previously held positions as a reporter and community engagement editor, Mr. Bradley was highly qualified for the position with over 20 years of experience at Gannett, including as sports editor from 2007 to 2014 and content strategist from 2014 through 2020, where he served as a leader of the newsroom team and had up to 15 total employees under his direct supervision.

68.     Mr. Bradley was also appointed to the national USA Today Network cross-team that devised strategies and shared best practices for high school sports coverage, resulting in digital subscription growth increasing by 36 percent from 2019 to 2020. Moreover, in addition to coordinating sports strategy in the Democrat & Chronicle's home location of Rochester, New York, Mr. Bradley also coordinated sports strategy for Gannett in Binghamton, New York, Ithaca, New York, Elmira, New York, and Burlington, Vermont.

69.     In addition to his leadership experience, Mr. Bradley had received multiple awards and recognitions for his contributions demonstrating his vastly superior qualifications for the

position. For example, he was awarded the 2013 Democrat and Chronicle Editor of the Year, 2013 Distinguished Sports Coverage Award from New York News Publishers Association and first place for Continuing Coverage in New York State Associated Press contest. He was a member of the team that won Gannett's 2016 Innovation Challenge. Between 2015 and 2020, Mr. Bradley served as a leader for a newsroom team that received Newspaper of Distinction honors from the New York State Associated Press Association on three separate occasions.  While serving as a content strategist, Mr. Bradley led coverage that received first-place recognition from the New York News Publishers Association and the New York State Associated Press Association in categories such as breaking news, business coverage, feature writing and special sections.

70.     Mr. Bradley's extensive and successful roles at Gannett, as well as the company and industry awards he received, were the sorts of objective accomplishments that Gannett used as criteria to make hiring and promotion decisions when race was not a part of the decision-making process. Given that he had significantly more of these accomplishments than Ms. Rayam, absent taking race into account, Gannett would have hired Mr. Bradley as executive editor of Gannett's Mohawk Valley operations, including the Utica Observer-Dispatch, as multiple members of Gannett management told Mr. Bradley.

71.     In the Utica Observer-Dispatch article announcing Ms. Rayam's hire, Gannett made it a large point of emphasis to note that she was the first Black executive editor for Gannett's Mohawk Valley operations.[5]

72.     Gannett could not provide any explanation, other than enforcement of their Reverse Race Discrimination Policy, concerning how someone far less qualified who was not even under

---

[5]     *See Sheila Rayam to lead Gannett's Mohawk Valley newsrooms*, UTICA OBSERVER-DISPATCH, (March 22, 2021), *available at* https://www.uticaod.com/story/news/2021/03/22/sheila-rayam-editor-utica-observer-dispatch-herkimer-times-telegram/4798569001/.

consideration for the position when he was informed they were down to two finalists was selected over Mr. Bradley.

73.    Indeed, a later interview Ms. Rayam gave reflecting back on the executive editor position for Gannett's Mohawk Valley operations states that she was approached about the position and asked if she'd like to run her own newsroom.[6]

74.    Because of the Reverse Race Discrimination Policy, Gannett chose not to hire Mr. Bradley on the basis of his race and instead went outside the applicant pool and hand selected a candidate that, irrespective of her qualifications, satisfied the quotas Gannett was seeking to achieve.

75.    There can be no doubt Mr. Bradley's job performance was not the reason he was not hired. On the contrary, Mr. Bradley, as set forth in more detail above, was a distinguished worker of Defendant, receiving multiple awards and recognitions for his contributions and leadership.

### *Stephen Crane*

76.    As an editor and newsroom leader, Mr. Crane occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

77.    In March 2020, as a result of the Reverse Race Discrimination Policy, Katrice Hardy, a Black woman, was appointed to serve as executive editor of The Indianapolis Star, which also entailed overseeing more than two dozen Gannett newsrooms throughout Indiana, Illinois and Kentucky, including The Reporter Times, Mooresville-Decatur Times, The Herald-Times, and Hoosier Topics, and was appointed by Gannett to lead efforts to compile the demographic newsroom workforce data used to spearhead the Reverse Race Discrimination Policy.

78.    As a result of the Reverse Race Discrimination Policy, Ms. Hardy directly discriminated against Mr. Crane based on his racial status, directly affecting his ability to adequately perform his job responsibilities.

---

[6]    *New Buffalo News Editor Credits Buffalo State for Early Success*, BUFFALO STATE, (Oct. 24, 2022), *available at* https://suny.buffalostate.edu/news/new-buffalo-news-editor-credits-buffalo-state-early-successes.

13

79.     For example, while serving as editor, Mr. Crane was informed that Gannett preferred candidates of certain races be sought for open positions he was charged with filing.

80.     After the RRDP was implemented, Gannett began to force Mr. Crane to engage in a number of unethical and discriminatory actions.

81.     Among other things, he was required to rescind a job offer to candidate because the candidate was White, even though, as he explained to Gannett, there were no other qualified candidates, particularly minorities with a journalism background, that were available in the middle of Indiana.

82.     Mr. Crane found it distasteful and offensive to be required to engage in illegal racial discrimination, and all the more so to a well-qualified candidate who had already been given a job offer.

83.     Gannett also required Mr. Crane to write articles that he knew to be inaccurate, for example to report that an attempted lynching had occurred, even though it was well known in the community that the supposed victim was mentally unstable and had a pattern of making false accusations.

84.     Gannett, however, required that Mr. Crane not provide all the relevant facts but instead cover the story as though the lynching accusation was true. Mr. Crane did not like being required to betray his journalist ethics to write a story that only stirred more racial hatred and resentment. After it was soon discovered that the lynching, like the other hoaxes the individual had done before, was fake.

85.     Gannett had made Mr. Crane complicit in a lie that had only fueled racial tension in the area.

86.     Mr. Crane had protested both situations, but his complaints were brushed aside and Gannett management saw him as an obstacle to implementing the RRDP at his papers and grew colder to him.

87.     Gannett's requests did not let up, though. He was instructed to write articles praising the RRDP. This he found again to be unacceptable.

88.     His managers knew his opposition to racial discrimination, as well as being told to write content which violated his journalist ethics and to do so by lying about his personal beliefs. He wrote two articles but each of them was not deemed radical enough by Gannett management.

89.     His internal complaints were met with hostility, which eventually culminated in a review by his managers. Previously, Mr. Crane was known for getting good feedback, but this time the review was very different. He was given some of the lowest scores possible. Moreover, Gannett justified these scores by referring to his failure to carry out some of the discriminatory directives the company required of him.

90.     He also knew the consequences of these low scores. They gave him a 0% chance of getting any increase, any bonus, or any promotion. He knew this both because he gave reviews to employees, and he knew the effect of these scores.

91.     He also complained to both his direct manager and HR and none of them indicated in any way he was wrong about the consequences. In an attempt to resolve the issue, he for the first time in his life, filed a complaint with HR who did nothing to remedy the issue.

92.     Following the rejection of his complaint, Mr. Crane faced an agonizing decision: could he continue to tolerate working for Gannett? With regret, he concluded that it would be intolerable to continue to work there and he left employment.

93.     Several factors went into his decision. First, Gannett took and vowed to continue to take tangible job benefits away from him because he had complained about the illegal and discriminatory policies he was forced to follow.

94.     Second, if stayed he would face an intolerable choice of either engaging in or vocally supporting illegal discrimination—a prospect that he found odious, legally wrong, and would expose him to potential liability as he violated his personal ethics and ethics as a journalist.

95.     If he continued to resist internally, Gannet made it clear that was unacceptable and he would be terminated, made all the easier because of his bad evaluation. A termination would further damage his career.

96.     As a result of the Reverse Race Discrimination Policy, Ms. Hardy also directly discriminated against Mr. Crane based on his racial status with a biased non-objective performance evaluation, citing two instances of race-based editorial directives, including a directive promoting racial discriminatory hiring practices in Gannett. Although Ms. Hardy was responsible for and wrote the performance evaluation, she directed newly hired Cynthia Adams to report the evaluation to Mr. Crane on her behalf. Despite Mr. Crane's objections to her evaluation, Ms. Hardy stood her ground, forcing Mr. Crane to file a complaint with HR.

97.     Indeed, despite outstanding performance across all metrics, the biased non-objective performance evaluation received was in retaliation for Mr. Crane voicing discomfort over directives he received stemming from the Reverse Race Discrimination Policy, including concerns he raised regarding Gannett's discriminatory hiring practices.

98.     Given that HR supported Ms. Hardy's enforcement of the Reverse Race Discrimination Policy, including the failure to revoke the biased retaliatory performance review he received for voicing opposition to Gannett's discriminatory practices, Mr. Crane felt he had no other choice than to resign in May of 2021.

99.     In a column published on his last day at The Herald-Times, Mr. Crane wrote that the "last year [had] been the most difficult of my life."

***Noah Hiles***

100.    As a sports reporter, Mr. Hiles occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

101.    Mr. Hiles was subject to discrimination based on his racial status before he was even brought on as a sports reporter for the Beaver County Times in February 2021. Indeed, despite local

16

leaders of the Beaver County Times expressing a desire to hire him immediately in light of his impressive credentials and experience, as a result of the Reverse Race Discrimination Policy, his hiring was delayed for approximately two months, purely on the basis that he did not fit the racial status needed to satisfy defendants' racial quotas.

102.    Two months into starting the position, the sole other member of the Beaver County Times sports staff quit, leaving Mr. Hiles as the leader and *de facto* sports editor. Here, *inter alia*, Mr. Hiles took on additional roles such as creating the sports budget on a weekly basis, along with giving coverage assignments to freelance reporters and photographers.

103.    Despite taking on additional roles and serving as the leader and *de facto* sports editor, as a result of the Reverse Race Discrimination Policy, Defendant refused to provide Mr. Hiles the pay and job title associated with the work he was performing.

104.    Not only did the Reverse Race Discrimination Policy result in Mr. Hiles not receiving the pay and job title associated with the work he was performing, but it also resulted in Mr. Hiles being discriminated against on the basis of pay even assuming he was not performing the additional roles.

105.    Understanding that the Beaver County Times was looking to hire additional individuals for their sports staff, Mr. Hiles offered to use his contacts to help fill the openings. At this point, as a result of the Reverse Race Discrimination Policy, he was informed that the position needed to be filed by individuals of certain racial statuses.

106.    Thus, in good faith, Mr. Hiles started reaching out to his contacts that satisfied the racial pre-requisite about the position. After offering the position to two other Black or African American candidates, each of whom ultimately rejected the offers, the Beaver County Times hired one of the workers that satisfied Gannett's racial pre-requisites that Mr. Hiles introduced as part of his outreach efforts, Parth Upadhyaya.

17

107. Although Mr. Upadhyaya was hired under the same job title as Mr. Hiles, despite Mr. Hiles having more experience, a proven track record of success, including by serving as the *de facto* sports editor, and overseeing Mr. Upadhyaya on a daily basis from the outset, in August 2021, Mr. Hiles found out that Mr. Upadhyaya's salary was approximately 17% higher than he was earning.

108. Upon this revelation and given that he was working as the *de facto* sports editor, Mr. Hiles approached management about a raise. He was informed that due to the Reverse Race Discrimination Policy, they had to pay Mr. Upadhyaya the higher salary to ensure they satisfied their racial quota and that he would accept the position. Because Mr. Hiles was White, he was not afforded the same treatment. Mr. Hiles was further informed that he would have to wait until at least a year of working for Defendant before a raise could even be considered, and even then, would have to be assessed based on his performance.

109. Even when Mr. Upadhyaya's performance became an issue, leading Mr. Hiles to take an even more active role in overseeing Mr. Upadhyaya's work, management still maintained Mr. Upadhyaya's salary at approximately 17% higher than Mr. Hiles, noting the difficulty they would face replacing Mr. Upadhyaya with another worker that satisfied their race-based quotas.

110. Nevertheless, Mr. Hiles continued to excel, outperforming Mr. Upadhyaya in every metric.[7] Yet, even after delaying any raise five months beyond the one-year period previously discussed, with the raise Mr. Hiles received, he was still being paid less than Mr. Upadhyaya.

111. Gannett could not provide any explanation to Mr. Hiles, other than his race and the Reverse Race Discrimination Policy, concerning how someone far less qualified, with fewer responsibilities and incomparable accolades, should be entitled to a higher salary.

---

[7] While working as a sports writer, Mr. Hiles was a distinguished worker of Gannett. He earned a "top 10" spot in multiple categories among the top sports writers in the United States at the Associated Press Sports Editors Awards, was honored as a finalist in the national Best of Gannett awards during the Division III Sports Reporting category, was awarded first place in the Sports Beat Reporting and Sports Feature categories at the 2022 Pennsylvania NewsMedia Association Keystone Awards, and earned two first-place awards and was a finalist for another category in the 2022 Press Club of Western PA Golden Quills Awards.

112.    Gannett chose to pay Mr. Upadhyaya approximately 17% higher than Mr. Hiles on the basis of their respective races, so Gannett could satisfy the quotes they were seeking to achieve set forth in their Reverse Race Discrimination Policy.

### Barbara Augsdorfer

113.    As a reporter, Mrs. Augsdorfer occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

114.    After the 2019 merger which placed the Savannah Morning News under Gannett, it became clear that steps were being taken so Gannett could satisfy the racial quotas they were seeking to achieve through their Reverse Race Discrimination Policy.

115.    In June 2020, roughly 6 months after Mrs. Augsdorfer was hired at the Savannah Morning News, as a result of the Reverse Race Discrimination Policy, Rana L. Cash, a Black woman, was hired to replace Susan Catron as the executive editor of the Savannah Morning News. Ms. Cash spearheaded Gannett's Reverse Race Discrimination Policy for the Savannah Morning News, emphasizing the need to hire more Black newsroom workers regardless of the discriminatory impact, noting that Gannett "must find new and creative ways to change the face of [their] company."[8]

116.    With respect to the Savannah Morning News, pursuant to the Reverse Race Discrimination Policy, from 2020 to 2022, the number of White workers decreased by 27.4%, while the number of Black workers increased by 18.2%.

117.    One of the "new and creative ways" to make room for hiring another Black newsroom worker as part of the Reverse Race Discrimination Policy, occurred when Mrs. Augsdorfer's work assignment was surprisingly transferred from covering education and nonprofits to covering two local counties, Bryan County and Effingham County.

---

[8]    *On matters of race, our newsroom has fallen short. Here's how we'll be better for Savannah*, Rana L. Cash, SAVANNAH MORNING NEWS, (Aug. 20, 2020), *available at* https://www.savannahnow.com/story/special/2020/08/20/on-matters-of-race-our-newsroom-has-fallen-short-herersquos-how-wersquoll-be-better-for-savannah/114851796/.

118.    Her previous job duties were assumed by a Black employee.

119.    This new assignment was disadvantageous to Ms. Augsdorfer in a number of ways. These included the fact that the new assignment required her to: 1) work later and longer hours in order to cover evening meetings of the county government; 2) travel more extensively and much more frequently over a two-county area; 3) work covering stories of less interest; and 4) be assigned to a position that was shortly going to be eliminated.

120.    Despite performing well and expressing a desire to continue coverage of education and nonprofits, Mrs. Augsdorfer was told that the transfer was necessary as coverage of these counties was a necessity. However, this was clearly not the case. Rather, the transfer was part of the process to move on from Mrs. Augsdorfer so that a Black or African American worker could take over her coverage of education and nonprofits.

121.    Soon after her coverage was transferred, as part of the Reverse Race Discrimination Policy, a Black or African America worker with far less experience was hired to cover education and non-profits. Moreover, when this occurred, Mrs. Augsdorfer was instructed to turn over all her contacts from her time covering education and non-profits, which she graciously did. However, when she requested contacts associated with the two local counties she was now assigned to cover, she was denied.

122.    Moreover, soon thereafter, to Mrs. Augsdorfer's surprise, she was informed for the first time that her performance was not up to par, placed on a performance plan, and then ultimately had her work relationship terminated in November 2021.

123.    It became clear that the transfer from education and nonprofits and subsequent placement on a performance plan, was not the result of an apparent need for coverage in another area or job performance, but a creative ploy to fulfill the Reverse Race Discrimination Policy and make room to hire another Black or African American newsroom worker in Mrs. Augsdorfer's place. Indeed, after Mrs. Augsdorfer's termination, no one was hired to cover the two local counties that she

was informed necessitated her transfer and defendants support of and actions towards Mrs. Augsdorfer while she was covering the two local counties, including refusal to provide her with contacts, did not support the notion that the transfer was necessary as coverage of these counties was a necessity.

### *Logan Barry*

124.    As a multimedia local government reporter, Mr. Barry occupied one of the positions specifically targeted by Gannett with their Reverse Race Discrimination Policy.

125.    Mr. Barry was hired by The Progress-Index in June 2018 to serve as a multimedia reporter covering local and state government, including a focus in economic development, as well as general and community news.

126.    While working as a multimedia reporter covering local and state government, Mr. Barry excelled at his duties to the point that management informed him that he was amongst the highest performers in the newsroom and that they intended to tap him for what he understood to be a full-time leadership role, the Team Lead.

127.    After the 2019 merger which placed The Progress-Index under Gannett, it became clear that steps were being taken so Gannett could satisfy the racial quotas they were seeking to achieve.

128.    Despite previously being informed by management that he was amongst the highest performers in the newsroom and that they intended to tap him for a leadership role, and urging him to stay on for that purpose, without any notice or even the opportunity to formally apply, the full time leadership Team Lead role was awarded to a Black or African American woman, Leilia Magee. Had Mr. Barry been aware of the opportunity to apply for the position, he would have done so.

129.    Gannett chose not to hire or even give Mr. Barry the opportunity to formally apply to the role on the basis of his race and instead hired a Black or African American woman with less accolades and experience, that satisfied the racial quotas Gannett was seeking to achieve. This was

despite the fact that Gannett management had repeatedly told Mr. Barry that he was the most qualified employee for the role. Even though Gannett management admitted that Mr. Barry was more qualified for the role than other employees, such as Ms. Magee, Gannett gave the job to Ms. Magee because of her race. Moreover, as a result of the Reverse Race Discrimination Policy, Mr. Barry's work relationship with Gannett was terminated.

## FIRST  CAUSE OF ACTION
### *Race Discrimination – U.S.C. § 1981*
### (On behalf of Named Plaintiffs and the Class)

130.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs as if fully restated herein.

131.    Under § 1981 of the Civil Rights Act, it is unlawful for a Defendant to discriminate against its workers because of their race.

132.    Defendant has engaged in an intentional, company-wide, and systematic practice of discrimination against workers on the basis of their race, including by:

a.    Creating racial quotas with goals of having the racial demographic of a newsroom match the racial demographics of the location where the newsroom is located.

b.    Giving executives incentives to reduce the number of workers of certain races in their newsrooms.

c.    Giving preferential treatment to workers on the basis of their race in hiring, promotions, salary, and other terms and conditions of their work relationship with Defendant.

133.    Defendant's invidious race discrimination adversely and directly affected the terms, conditions, and privileges of Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, Logan Barry, and the Class's work relationship with Defendant.

134.    As the direct and proximate result of Defendant's Reverse Race Discrimination Policy, Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, Logan Barry and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

22

135.    As the direct and proximate result of Defendant's Reverse Race Discrimination Policy, Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, Logan Barry and the Class suffer the right to seek future employment from Defendant, one of the largest newspaper chains in the United States.

136.    Defendant's discriminatory and unlawful practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Named Plaintiffs and the Class. As a result, Named Plaintiffs and the Class are entitled to injunctive relief, compensatory, and punitive damages together with all other remedies available, including but not limited to, back pay, front pay, reinstatement, and/or other equitable remedies.

**WHEREFORE**, Named Plaintiffs and the Class demand judgment against Defendant in their favor and that they be given the following relief:

(a)    an order certifying the Class as requested and designating Thomas & Solomon LLP as class counsel;

(b)    designation of Named Plaintiffs Steve Bradley, Stephen Crane, Noah Hiles, Barabara Augsdorfer, and Logan Barry as the representatives of the Class;

(c)    public injunctive relief requiring Defendant, its successors in office, agents, employees, and assigns, and all other persons acting in concert with them, to eliminate the Reverse Race Discrimination Policy;

(d)    an award to Named Plaintiffs, and the Class, of the value of lost wages, back pay, including lost fringe benefits, which resulted from the discriminatory acts and practices of Defendant;

(e)    liquidated damages in an amount equal to the sum of the amount of the Named Plaintiffs and the Class's lost wages, back pay, including fringe benefits, which resulted from the discriminatory acts and practices of Defendant;

(f)    an award to Named Plaintiffs and the Class of the value of future lost wages and lost future fringe benefits which resulted from the discriminatory acts and practices of Defendants, or other appropriate equitable relief;

(g)    an order restoring Named Plaintiffs and Class Members to their rightful positions, or in lieu of reinstatements, an order for front pay benefits;

(h)      an award to Named Plaintiffs and the Class of civil penalties provided by the relevant statutes;

(i)      an award of consequential damages sustained by Named Plaintiffs and the Class as a result of the discriminatory acts and practices of the Defendant;

(j)      an award of punitive damages;

(k)      an award of compensatory damages in an amount determined by the jury to be able to reasonable compensate Named Plaintiffs and the Class for the humiliation, indignity, embarrassment, damage to her reputation, emotional distress, emotional pain and suffering and the loss of enjoyment of life they have endured as a result of Defendant's conduct;

(l)      awarding Named Plaintiffs and the Class appropriate relief, including awarding reasonable attorneys' fees, expenses, expert fees, and costs incurred in vindicating Named Plaintiffs, the Class's rights;

(m)      an award of pre- and post-judgment interest;

(n)      awarding a service payment for Named Plaintiffs Steve Bradley, Stephan Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry; and

(o)      such other and further legal or equitable relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all questions of fact.

Dated:  September 19, 2024

HARVEY LAW OFFICES, PLLC

By:  /s/ *Philip J. Harvey*
Philip J. Harvey (VSB #37941)
Paris R. Sorrell (VSB #80953)
717 King Street, Suite 200
Alexandria, VA 22314
(571) 771-0028 (telephone)
(703) 888-1930 (facsimile)
pjharvey@harveylawofcs.com
psorrell@harveylawofcs.com

and

**THOMAS & SOLOMON LLP**
J. Nelson Thomas, Esq. (*pro hac vice*)
Adam T. Sanderson, Esq. (*pro hac vice*)
693 East Avenue
Rochester, New York 14607
(585) 272-0540 (telephone)
(585) 272-0574 (facsimile)
nthomas@theemploymentattorneys.com
asanderson@theemploymentattorneys.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

/s/ *Philip J. Harvey*
Philip J. Harvey (VSB #37941)