IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| STEVEN BRADLEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-1100 (RDA/WEF) |
| | ) | |
| GANNETT CO. INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Gannett Co. Inc.'s Motion to Dismiss the Second Amended Complaint and to Dismiss/Strike Class Allegations. Dkt. 59. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Second Amended Complaint (Dkt. 56), Defendant's Memorandum in Support (Dkt. 60), Plaintiffs' Opposition (Dkt. 62), and Defendant's Reply Brief (Dkt. 63), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background[1]

Plaintiffs Steven Bradley, Stephen Crane, Noah Hiles, Barbara Augsdorfer, and Logan Barry (collectively, "Plaintiffs"), assert that they are bringing the Second Amended Complaint

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Second Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

(Dkt. 56) on behalf of themselves and on behalf of other persons similarly situated (the "Proposed Class").

Defendant is a mass media holding company and one of the largest newspaper publishers in the United States. Dkt. 56 ¶ 19. The newspapers it publishes include USA Today. *Id.* Plaintiffs allege that, in 2020, Defendant sought to "institutionalize and tighten a company-wide policy [the 'Policy'] which was purportedly designed to achieve inclusion quotas, but practically speaking disadvantaged class members in terms of their work and/or prospective work for the company." *Id.* ¶ 21. Plaintiffs allege that, under the Policy, Defendant "imposed specific racial quotas in regard to employment." *Id.* ¶ 22. Plaintiffs assert that the Policy was "a specific plan that dictated for at least the next five years employment decisions at Gannett would be done to ensure that the company's set numerical racial requirements in the workforce were met." *Id.* ¶ 24.

Plaintiffs now allege that Defendant's 2020 Inclusion Report is not the Policy,[2] but that it reflects a goal of "[a]chiev[ing] racial and gender parity with the diversity of our nation, throughout our workforce." *Id.* ¶ 28. In the 2020 Inclusion Report, Defendant committed to publishing demographics regarding the racial composition of its workforce on an annual basis. *Id.* ¶ 30. Plaintiffs further allege, upon information and belief, that leadership at Defendant were entitled to certain bonuses based on achieving racial parity. *Id.* ¶ 32. Plaintiffs allege that articles published by Defendant reflected that they desired to "help us reflect better the full range of people who live" in the areas covered. *Id.* ¶ 33-34. Plaintiffs also allege, upon information and belief, that managers were told "that no more straight White males should be hired going forward." *Id.* ¶ 36.

_____

[2] In the prior Amended Complaint, Plaintiffs suggested that the 2020 Inclusion Report was the Policy. Dkt. 55 at 2 & nn.4-5; Dkt. 36-1 ¶ 25 (Sanderson Affidavit).

Plaintiffs assert that their proposed class (the "Proposed Class") consists of: "all individuals who were subject to" the Policy and who either (i) "work or worked for Gannett based on any form of contractual relationship" or (ii) "were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship." *Id.* ¶ 44. Plaintiffs assert that the Proposed Class "is believed to be over 40 members" and notes that Defendant has over 100 brands employing newsroom members who were subject to the Policy. *Id.* ¶ 45. Plaintiffs allege that there are common issues of law and fact that exist as to all Proposed Class members including: (i) whether an injunction is warranted; (ii) whether Defendant subjected their workers to the Policy; (iii) whether the Policy amounts to discrimination or preferential treatment on the basis of race; (iv) whether the Proposed Class is entitled to declaratory relief; and (v) "[w]hether equitable remedies, compensatory damages, and punitive damages for the Class is [sic] warranted." *Id.* ¶ 46. Plaintiffs assert that they have no interests antagonistic to the Proposed Class. *Id.* ¶ 48. With respect to the relief available, Plaintiffs assert that "proper relief for Plaintiffs' claims can include reinstatement." *Id.* ¶ 56.

Plaintiffs also make specific allegations with respect to the individual Plaintiffs, who are also the proposed class representatives.

<u>Plaintiff Steven Bradley</u>

Plaintiff Bradley worked for Defendant from 1999 to 2020. *Id.* ¶ 9. Plaintiff Bradley was a content strategist and newsroom leader. *Id.* ¶ 58. He asserts that his position was specifically targeted by Defendant under the Policy. *Id.* Plaintiff Bradley was terminated from the Democrat and Chronicle – a Defendant publication – after 21 years. *Id.* ¶ 59. Plaintiff Bradley asserts that, when he was terminated, the Democrat and Chronicle's Executive Editor stated that he "decided to terminate Mr. Bradley's employment rather than another worker, Mark Liu, because Mr. Liu

3

was Asian and Mr. Bradley was White." *Id.* ¶ 60.  At the same time, another White member of the sports writing staff was terminated after working for Defendant for 37 years. *Id.* ¶ 61.

In January 2021, Plaintiff Bradley submitted an application for the open position of executive editor of Defendant's Mohawk Valley operations, which included the Utica Observer-Dispatch. *Id.* ¶ 63.  After submitting his application and participating in at least three interviews, Plaintiff Bradley was informed that Defendant was seriously considering him for the position and that he was one of two finalists, and the other finalist was also a White male. *Id.* ¶ 64.  In March 2021, Plaintiff Bradley was informed that a new candidate had emerged and was selected for the position – Sheila Rayam, a Black woman. *Id.* ¶¶ 65-66.  Ms. Rayam had previously held positions as a reporter and as a community engagement editor. *Id.* ¶ 67.  Plaintiff Bradley had 20 years of experience at Defendant, including time as a sports editor from 2007 to 2014 in addition  time as a content strategist from 2014 to 2020, where he had 15 employees under his supervision. *Id.* Plaintiff Bradley had also received a number of awards and accolades during his time with Defendant. *Id.* ¶ 69.  Ms. Rayam was the first Black executive editor for Defendant's Mohawk Valley operations. *Id.* ¶ 71.

<u>Stephen Crane</u>

Plaintiff Crane worked for Defendant from 2019 to 2021. *Id.* ¶ 11.  In March 2020, Katrice Hardy – a Black woman – was hired to serve as executive editor of The Indianapolis Star, which entailed overseeing more than two dozen newsrooms throughout Indiana, Illinois, and Kentucky. *Id.* ¶ 77.  While serving as editor,[3] Plaintiff Crane asserts that he was forced to rescind an offer made to a White male applicant. *Id.* ¶ 81.  Plaintiff Crane also asserts that Defendant "required

---

[3] Plaintiffs do not specifically identify Plaintiff Crane's position outside of calling him an "editor."

Mr. Crane to write articles that he knew to be inaccurate." *Id.* ¶¶ 83-84. Defendant also required Plaintiff Crane to write articles (which he found unacceptable) praising the Policy. *Id.* ¶ 87. Plaintiff Crane complained about being forced to write on such topics, but he alleges that his internal complaints were met with hostility. *Id.* ¶ 89.

Later, Plaintiff Crane received a low performance score in his reviews based on his failure to carry out what he asserts were "the discriminatory directives the company required of him." *Id.* ¶ 89. Plaintiff Crane believed that the low scores gave him no chance of getting any pay increase, any bonus, or any promotion. *Id.* ¶ 90. Plaintiff Crane then complained to his direct manager and human resources, but nothing was done to remedy the issue. *Id.* ¶ 91. In May 2021, Plaintiff Crane resigned and, in resigning, published an article calling the last year "the most difficult of my life." *Id.* ¶ 99.

<u>Noah Hiles</u>

Plaintiff Hiles worked for Defendant from 2021 to 2022 as sports reporter for the Beaver County Times. *Id.* ¶¶ 13, 101. Plaintiff Hiles asserts that his hiring was delayed for two months, despite "local leaders"[4] expressing a desire to hire him immediately. *Id.* ¶ 101. Two months after being hired, the only other member of the Beaver County Times sports staff quit. *Id.* ¶ 102. This left Plaintiff Hiles as the *de facto* sports editor and resulted in his creation of a sports budget as well as delegating sports assignments to freelance reporters and photographers. *Id.* Despite taking on this additional work, Plaintiff Hiles was not promoted to sports editor. *Id.* ¶ 103. Plaintiff Hiles asserts that he attempted to assist in the hiring of other sports editors and that he was instructed to assist in finding minorities to fill those positions. *Id.* ¶ 105. Two African-American candidates

---

[4] It is unclear what "local leaders" means in this context and whether Plaintiffs intend to assert that these individuals were part of the hiring committee.

were offered positions but rejected them. *Id.* ¶ 106. Ultimately, Defendant hired Parth Upadhyaya, in part due to Plaintiff Hiles' outreach efforts. *Id.*

Although Mr. Upadhyaya was also hired as a sports reporter, Plaintiff Hiles learned Mr. Upadhyaya was being paid approximately 17% more than him. *Id.* ¶ 107. Plaintiff Hiles then asked for a raise. *Id.* ¶ 108. Plaintiff Hiles asserts that he was informed that, due to the Policy, "they had to pay Mr. Upadhyaya the higher salary to ensure they satisfied their racial quota and that he would accept the position." *Id.* ¶ 108. Plaintiff Hiles was then told that he would have to wait a year to be considered for a raise and that it would be based on his performance. *Id.*

### Barbara Augsdorfer

Plaintiff Augsdorfer was a reporter with Defendant from 2020 to 2021. *Id.* ¶¶ 15, 113. In June 2020, roughly six months after Plaintiff Augsdorfer was hired at the Savannah Morning News, Rana L. Cash – a Black woman – was hired as the executive editor. *Id.* ¶ 114. As executive editor, Ms. Cash emphasized a need to hire more Black newsroom workers. *Id.* ¶ 114. From 2020 to 2022, the number of White workers at the Savannah Morning News decreased by 27.4%, and the number of Black workers increased by 18.2%. *Id.* ¶ 116. At some point, Plaintiff Augsdorfer's work assignment was transferred from covering education and nonprofits to covering two local counties, Bryan and Effingham Counties. *Id.* ¶ 117. Plaintiff Augsdorfer's former duties were assumed by a Black employee. *Id.* ¶ 118. The new assignment required Plaintiff Augsdorfer to work later and longer hours to cover county government, travel more extensively, and cover stories of less interest. *Id.* ¶ 119.

Despite expressing her preference to continue covering education and nonprofits, Plaintiff Augsdorfer was told that the transfer was necessary. *Id.* ¶ 120. Plaintiff Augsdorfer was also instructed to turn over all of her contacts from her time covering education, which she did. *Id.*

¶ 121. When Plaintiff Augsdorfer requested contacts for her new counties, she was denied. *Id.* Plaintiff Augsdorfer was later informed that her performance was not up to par, placed on a performance improvement plan, and ultimately terminated in November 2021. *Id.* ¶ 122. No one was hired to replace Ms. Augsdorfer with respect to covering Bryan and Effingham Counties. *Id.* ¶ 123.

<u>Logan Barry</u>

Plaintiff Barry worked for Defendant from 2019 to 2020 as a multimedia local government reporter for The Progress-Index. *Id.* ¶¶ 17, 12-26. At some point in time, apparently prior to the merger with Defendant, management informed Plaintiff Barry that he was amongst the highest performers in the newsroom and that they intended for him to become a Team Lead in the future. *Id.* ¶ 126. Later, a full-time Team Lead role was awarded to Leila Magee – a Black woman. *Id.* ¶ 128. Plaintiff Barry alleges that Ms. Magee had "less accolades and experience." *Id.* ¶ 129.

B.  Procedural Background

On August 18, 2023, Plaintiffs filed their Complaint. Dkt. 1. Before Defendants had an opportunity to respond to the Complaint, Plaintiffs filed a Motion to Stay Issuance of a Rule 16 Order and Bifurcate this Matter into Three Phases. Dkt. 8. On November 24, 2023, Defendant filed a Motion to Dismiss the Complaint. Dkt. 17. Defendant also opposed Plaintiff's Motion. Dkt. 20. On November 27, 2024, Magistrate Judge Fitzpatrick denied Plaintiff's Motion as premature. Dkt. 22.

On December 15, 2023, Plaintiffs filed an Amended Complaint asserting one count, on behalf of all class members, of race discrimination pursuant to 42 U.S.C. § 1981. Dkt. 28. Defendant's first motion to dismiss was subsequently denied as moot. Dkt. 29.

On January 8, 2024, Defendant filed a new Motion to Dismiss/Strike Class Allegations. Dkt. 33. On August 20, 2024, this Court issued a Memorandum Opinion and Order dismissing the Amended Complaint without prejudice and striking the class allegations. Dkt. 55.

On September 19, 2024, Plaintiffs filed the Second Amended Complaint. Dkt. 56. On October 3, 2024, Defendant filed the pending Motion. Dkt. 59. On October 17, 2024, Plaintiffs filed their Opposition, Dkt. 62, and, on October 23, 2024, Defendant filed its Reply, Dkt. 63.

## II. STANDARD OF REVIEW

### A. Rule 12(b)(6)

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of*

*Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

### B. Striking Class Allegations

A "court may strike from a pleading" class allegations "on motion made by a party" or "require that the pleadings be amended to eliminate" the class allegations. Fed. R. Civ. P. 12(f)(2); 23(d)(1)(D). A court should do so before discovery only "if the allegations are facially and inherently deficient." *Knapp v. Zoetis Inc.*, 2021 WL 1225970, at \*10 (E.D. Va. March 31, 2021).

### III. ANALYSIS

Plaintiffs' Second Amended Complaint again asserts a single count of race discrimination on behalf of the Plaintiffs and the Proposed Class pursuant to 42 U.S.C. § 1981. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Courts have recognized that "Title VII and [Section] 1981 apply to 'reverse discrimination' cases in which, as here, a member of the white majority alleges that [he or] she suffered adverse employment action on account of . . . race." *Wethje v. CACI-ISS, Inc.*, 2021 WL 718939, at \*4 (D. Md. Feb. 24, 2021).

The Court has traditionally applied the *McDonnell Douglas*[5] framework to Section 1981 claims where direct evidence of discrimination is lacking. *See Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). As recently reiterated by the Fourth Circuit in the context of a Section 1981 claim, more is required to survive a motion to dismiss than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir.

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

2022).   Moreover, the Supreme Court has recently clarified that to prove discrimination under Section 1981 a plaintiff must prove that "but for race, [he or she] would not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020).   Thus, applying *Comcast*, courts within this Circuit have held that allegations that race "may have played some role or even been a motivating factor," do not plausibly allege a Section 1981 claim.  *Nadendla v. WakeMed*, 2021 WL 1056521, at *2 (E.D.N.C. Feb. 23, 2021).

## A.  Allegations Regarding a Policy

Plaintiffs first seek to defend against the Motion to Dismiss by arguing that the Policy establishes race discrimination and that the Fourth Circuit's decision in *Duvall v. Novant Health, Inc.*, 95 F.4th 778 (4th Cir. 2024), requires denial of the Motion.  Plaintiffs are incorrect in both regards.

To begin with, Plaintiffs' allegations regarding the existence and contours of the "Policy" are conclusory and speculative.  Originally, Plaintiffs relied on the 2020 Inclusion Report to establish the existence of the Policy.  Dkt. 28 ¶¶ 22-25; Dkt. 36-1 at 4-5.[6]  Indeed, in an affidavit made under penalty of perjury, Plaintiffs' counsel created a chart that "highlights the great gulf between what Gannett's policy is and what the lawyers try to change it to be" and, in so doing, Plaintiff's counsel relied *solely* on the 2020 Inclusion Report as a representation of the Policy.

---

[6] Plaintiffs again purport to provide a link to the relevant 2020 Inclusion Report, Dkt. 56 at 5 n.1. However, as the Court noted in its prior Memorandum Opinion and Order, attempting to access the link results in an error message.  Dkt. 55 at 2 n.3.  Accordingly, the Court will again rely on the version of the policy that Plaintiffs attached with other briefing in this case.  Dkt. 41-4.  Such materials are appropriately considered in reviewing the Motion, as the 2020 Inclusion report is expressly referred to and incorporated into the Second Amended Complaint through citation to the broken link.

Dkt. 36-1 at 4 (relying on "Actual Language from the 2020" Report to establish "what Gannett's policy is"). Now, Plaintiffs have disavowed that the 2020 Inclusion Report is the Policy. Dkt. 56 ¶ 28 ("Although it was not the RRDP itself, Gannett's 2020 Inclusion Report noted Gannett's goals through 2025 . . . .").

Plaintiffs' Second Amended Complaint contains a number of allegations regarding what the Policy is not. According to Plaintiffs: (i) the Policy is not the 2020 Inclusion Report, *id.*; and (ii) the Policy is not a "diversity policy," *id.* ¶ 24. Plaintiffs include no details regarding the "Policy," thus the Court is left with significant questions regarding: (i) who developed and disseminated the Policy; (ii) what the specific contours of the Policy are; (iii) whether the Policy was written or simply verbal; (iv) how managers or editors in various newsrooms across the country were informed of the Policy; (v) who was charged with implementing the Policy; and (vi) how Plaintiffs know of the Policy. Plaintiffs' bare allegations that there was a Policy without sufficient factual details are vague, conclusory, and speculative. *See, e.g., Hanks v. City of Syracuse*, 2023 WL 8889764, at *3 (2d Cir. Dec. 26, 2023) (holding that allegations of "discriminatory employment policies" were "wholly 'conclusory' and woefully short on details"); *Onyango v. Nick & Howard, LLC*, 607 F. App'x 552, 556 (7th Cir. 2015) (holding that allegations that "treatment must be the result of a club policy of racial exclusion" were "too conclusory"); *Spellman v. Sch. Bd. of City of Chesapeake, Va.*, 2018 WL 2085276, at *13 (E.D. Va. 2018) (finding that plaintiff failed to plausibly allege a claim of race discrimination where, "[b]eyond Plaintiff's sole, conclusory allegation regarding the existence of Defendant's racially discriminatory custom or policy, the Complaint is devoid of facts evidencing the existence of such"). Accordingly, Plaintiffs' conclusory allegations with respect to the Policy are insufficient, on their own, to support Plaintiffs' Second Amended Complaint.

Moreover, Plaintiffs' conclusory allegations regarding the purported Policy are contradicted by the 2020 Inclusion Report. For example, Plaintiffs allege that the Defendant's alleged Policy "did not contain any requirement that employees be fairly treated," but the 2020 Inclusion Report upon which they continue to rely (previously used as the premise for the Policy) contradicts this allegation. *Contrast* Dkt. 56 ¶ 26 ("The RRDP did not contain any requirement that employees be fairly treated . . . ."), *with* Dkt. 41-4 at 9 (evincing a commitment to ensuring that "everyone has equal access and opportunities to thrive in a safe, welcome, and respectful environment"), *and id.* at 17 ("We must ensure everyone feels included and has equal opportunities to thrive."). Where Plaintiffs' allegations are contradicted by the documents that Plaintiffs incorporate into the Second Amended Complaint, the Court may "disregard" those allegations. *Pierce v. Ocwen Loan Servicing*, 2006 WL 1994571, at *2 (M.D.N.C. July 14, 2006); *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any attached exhibit . . . the exhibit prevails."); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) ("When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."). Thus, these allegations also fail to support a plausible claim of discrimination.

Plaintiffs also heavily rely on allegations made "upon information and belief." Dkt. 56 ¶¶ 32, 36 (alleging, upon information and belief, that managers were entitled to bonuses for hiring staff of different racial and ethnic background and that there was a policy that "no more straight White males should be hired going forward"). As judges in this District have held such allegations, upon information and belief, "veer away from supporting plausible inferences, and turn instead

toward unsupportable conclusory talismanic statements." *Carter v. Va. Dep't of Game & Inland Fisheries*, 2018 WL 3614975, at *9 (E.D. Va. July 27, 2018). Such allegations, without context to render such beliefs plausible, add little to the Court's consideration of the underlying claims here.

Thus, the allegations regarding the Policy leave the Court in a similar place to where it was when it previously considered this case. *See Bradley v. Gannett Co. Inc.*, 2024 WL 3905817, at *6 (E.D. Va. Aug. 20, 2024). That is, the Court is again left with allegations that support, based on the 2020 Inclusion Report, that a Policy regarding diversity and inclusion existed, but do not plausibly support Plaintiffs' allegations regarding an affirmative policy of reverse discrimination. *See id.* (citing *Weinerth v. Talley*, 2018 WL 2729205, at *4 (W.D. Va. June 6, 2018) (recognizing that a "goal of increasing diversity" is "legitimate and lawful")).

Plaintiffs' reliance on the Fourth Circuit's decision in *Duvall* does not change the calculus here, at least with respect to whether the purported Policy alone is sufficient to support the Second Amended Complaint. In *Duvall*, the Fourth Circuit considered an employer's challenge to the sufficiency of the evidence where a federal jury had found in favor of a Title VII plaintiff. *See* 95 F.4th at 781-82. There, taking all of the evidence in favor of the plaintiff, the Fourth Circuit held that it could not find that the "*only* conclusion a reasonable jury could have reached is one in favor of" the defendant. *Id.* at 791 (emphasis in original). The *Duvall* case stands on different grounds than Plaintiffs do here. To begin with, the *Duvall* case was a Title VII case – not a Section 1981 case. This matters because a Title VII plaintiff need only show that race is one of several "motivating" factors, but a Section 1981 plaintiff must "plead and ultimately prove that, but for race," the plaintiff would not have suffered the complained of act. *Strata Solar, LLC v. Fall Line Construction, LLC*, 683 F. Supp. 3d 503, 515 (E.D. Va. 2023). Moreover, the Fourth Circuit did

13

not rely on the alleged diversity policy alone – as Plaintiffs initially attempt to do here. Rather, the Fourth Circuit considered the diversity policy in conjunction with other facts. *Duvall*, 95 F. 4th at 791. Finally, the Fourth Circuit continued to acknowledge that "employers may, if they so choose, utilize D&I type programs" without running afoul of Title VII, but that the circumstances presented in that particular case established that the policy in conjunction with other facts were sufficient for a jury to find for the plaintiff. *Id.* at 791 n.10. Accordingly, although the *Duvall* case is instructive, it does not require that this Court deny the Motion based on Plaintiffs' conclusory allegations of a policy alone. Thus, the Court will examine the facts specific to each of the named plaintiffs.

### B. Claims as to Each Named Plaintiff

Defendant argues that each of the named Plaintiffs has failed to state a claim for relief under Section 1981. Dkt. 60. Accordingly, the Court analyzes the allegations of each individual Plaintiff.

#### i. *Steven Bradley*

Plaintiff Bradley bases his Section 1981 claim on two allegations: (i) his termination; and (ii) the failure to hire him as an executive editor. With respect to the first termination claim, this Court previously found that Plaintiff Bradley had released his termination claim based on the Separation Agreement. Dkts. 33-2, 59-8; *see Bradley*, 2024 WL 3905817, at *6-7 & n.15, 16, 18. Rather than acknowledge or address the Court's reasoning or the authority cited by the Court in reaching that conclusion, Plaintiff Bradley asserts – without citing any authority whatsoever – that the Court cannot consider the Separation Agreement. Dkt. 62 at 20-21. Here, Plaintiff Bradley has not added any new factual allegations that alter the Court's consideration with respect to the Separation Agreement nor has Plaintiff Bradley addressed the Court's prior opinion. Accordingly,

14

for the same reasons the Court previously found in *Bradley*, the Court grants the Motion with respect to the termination claim.  2024 WL 3905817, at *6-7.

As the Court noted previously, the Separation Agreement is not dispositive, however, of Plaintiff Bradley's failure to hire claim.  Here, again, Plaintiff Bradley's allegations in support of his failure-to-hire claim essentially boil down to the following facts: (i) Defendant sought out Ms. Rayam; (ii) Plaintiff Bradley had significant awards; and (iii) Plaintiff Bradley had been employed by Defendant for a long time.  Dkt. 56 ¶¶ 63-70.  Plaintiff Bradley conclusorily alleges his qualifications were greater than Ms. Rayam's qualifications for the executive editor position and asserts that Ms. Rayam "had only previously held positions as a reporter and community engagement editor."  *Id.* ¶ 67.  Here again, Plaintiff Bradely fails to address this Court's prior opinion on this matter.  *Bradley*, 2024 WL 3905817, at *7 (dismissing claim because Plaintiffs failed to allege that Ms. Rayam was not qualified and noting Ms. Rayam's qualifications as asserted in an article incorporated into the Amended Complaint).  Indeed, the allegations in the Second Amended Complaint regarding Ms. Rayam's qualifications are contradicted by the news article incorporated by Plaintiffs into the Second Amended Complaint.  *Contrast* Dkt. 56 ¶ 67 (Ms. Rayam "had only previously held positions as a reporter and community engagement editor"), *with id.* ¶ 71 & n.5 (incorporating article that explained that Ms. Rayam: (i) had been with the Democrat and Chronicle since 1990; (ii) had led the opinions section; (iii) had guided the mobile newsroom strategy; (iv) was a leader and key presenter in a working group regarding public safety; and (v) had roles at the company that included reporter, copy editor, site manager for a women's news site called herrochester.com, entertainment editor, social media editor, and most recently community

15

engagement editor and opinion editor).[7]  The article also contradicts Plaintiff Bradley's allegation that Ms. Rayam had "little to no prior newsroom management or supervisory experience" as the article recites that Ms. Rayam led the opinions section and the mobile newsroom strategy. *Contrast* Dkt. 56 ¶ 66, *with id.* ¶ 71 & n.5 (article reciting Ms. Rayam's experience).  But, as the Court previously noted, that Plaintiff Bradley subjectively viewed himself as more qualified is not enough to push his claims of discrimination across the line from possible to plausible.  *See McCleary-Evans v. Md. Dept. of Transp., State Hwy. Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (holding that plaintiff "can only speculate that the persons hired were not better qualified, or did not perform better in the interview, or were not better suited based on experience and personality for the positions"); *McCaskey v. Henry*, 2012 WL 1118851, at *3 (W.D.N.C. Apr. 3, 2012) (finding the plaintiff's allegations that she was "dependable, loyal, talented, strong, and creative" and had the requisite "experience, qualifications and readiness to be promoted" conclusory and insufficient to state a claim and emphasizing that "[a] plaintiff's mere assertion of general qualifications is not enough without some reference to an objective standard").

Indeed, with respect to the failure to hire claim, Plaintiff Bradley also fails to address *any* of the cases that the Court relied upon in reaching its prior conclusion that Plaintiff Bradley had failed to state a claim.  The Court's analysis applies equally here where Plaintiff Bradley has included essentially the same allegations, with some small variations not material to the ultimate result, and, by failing to acknowledge this Court's prior opinion, Plaintiff Bradley fails to explain to the Court why the Court should reach a different conclusion here.  Again, Plaintiff Bradley does

---

[7] Plaintiff Bradley has again incorporated by reference the article regarding Ms. Rayam into the Second Amended Complaint for the same reasons discussed in this Court's prior opinion. *See Bradley*, 2024 WL 3905817, at *7 n.17 (explaining how the article was incorporated by reference into the operative complaint).

not allege that Ms. Rayam was *not qualified*; rather, he simply alleges that Plaintiff Bradley was more qualified. *See Amis v. Pekoske*, 2021 WL 783543, at *3 (W.D.N.C. Mar. 1, 2021) ("Plaintiff makes no allegations that Ms. Gallagher did not meet the GS-14 or private sector qualifications; rather, he simply alleges that he was 'significantly more qualified . . . .' This is nothing more than speculation that Ms. Gallagher was 'not better qualified' than Plaintiff."). And, again, to the extent that Plaintiffs allege that Defendant preselected and sought out Ms. Rayam, those allegations also fail to establish a plausible allegation of race discrimination pursuant to Section 1981. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005); *Jackson v. Winter*, 497 F. Supp. 2d 759, 770 (E.D. Va. 2007) ("Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination."). Instead, each of Plaintiff Bradley's allegations seeking to tie his non-selection to his race remains vague and conclusory. *See, e.g.*, Dkt. 56 ¶ 66 (alleging "she was selected over Mr. Bradley on the basis of his race"); *id.* ¶ 74 (alleging that, "[b]ecause of the Reverse Race Discrimination Policy, Gannett chose not to hire Mr. Bradley on the basis of his race"). But Plaintiff Bradley fails to identify any of the decisionmakers with respect to his failure-to-hire claim and fails to assert that the decisionmakers knew of and were implementing the policy. Rather, Plaintiff Bradley amorphously alleges that Defendant, without identifying any individual through whom the corporate defendant acted, "chose not to hire him on the basis of race." Dkt. 56 ¶ 74. Accordingly, Plaintiff Bradley has again failed to state a claim for a violation of Section 1981 because: (i) his termination claim was released under the Separation Agreement; and (ii) he has failed to plausibly allege that race was the but-for cause of his non-selection.

### ii. Stephen Crane

Although it is not clear from Plaintiff Crane's allegations or the Opposition, the Court assumes that Plaintiff Crane continues to premise his Section 1981 claim on: (i) his alleged constructive discharge; and (ii) retaliation.[8] The Court begins with Plaintiff Crane's constructive discharge claim. A plaintiff may establish a constructive discharge by showing that his employer "deliberately made [his] working conditions intolerable in an effort to induce [him] to quit." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). That is, a plaintiff must show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016). But "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Heiko*, 434 F.3d at 262. "Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign"; rather, it is whether a reasonable person "would have had no choice but to resign." *Decoster v. Becerra*, 119 F.4th 332, 340 (4th Cir. 2024).

Although Plaintiff Crane broadly alleges that he "felt he had no other choice than to resign," Dkt. 56 ¶ 98, Plaintiff Crane falls well short of any objective standard of intolerability. In the Second Amended Complaint, Plaintiff Crane asserts that he felt compelled to resign for a number a reasons: (i) he was being forced to violate his "personal ethics and ethics as a journalist"; (ii) he

---

[8] As the Court noted in its prior opinion, to the extent Plaintiff Crane relies on other allegations regarding the hiring of other employees or the articles that he was assigned to write, those do not qualify as adverse employment actions. *See Bradley*, 2024 WL 3905817, at *7 n.19 (citing cases). The Court will, however, consider those actions with respect to Plaintiff Crane's retaliation claim.

would be exposed to "potential liability"; (iii) his negative performance evaluation gave him no chance for any pay increase, bonus, or promotion; and (iv) Defendant "took and vowed to continue to take tangible job benefits away from him." *Id.* ¶¶ 90, 93-94.  With respect to the last allegation, it is completely unclear from the Second Amended Complaint to what Plaintiff Crane refers when he alleges that Defendant "took and vowed to continue to take tangible job benefits away." *Id.* ¶ 93.  Plaintiff Crane does not specifically identify which, if any, benefits were taken away from him.  Rather, the Court assumes that Plaintiff Crane is referring to the impact of his negative performance review.  In that regard, Plaintiff Crane's allegations are entirely speculative.  Plaintiff Crane does not allege that he was eligible for and subsequently did not receive a pay increase, bonus, or promotion.  Instead, Plaintiff Crane merely speculates that he would not receive one in the future.  *See Sparenberg v. Eagle Alliance*, 2015 WL 6122809, at *9 (D. Md. Oct. 15, 2015) ("To show that a negative performance review is an adverse employment action, a plaintiff must show 'real, rather than speculative, employment injury.'  Here, Sparenberg fails to show the negative performance review led to any further consequences . . . .").

With respect to the other allegations, it is also unclear on what basis Plaintiff Crane could potentially be exposed to personal liability based on the allegations in the Second Amended Complaint, and he identifies none.  Thus, these circumstances are also too speculative.  Finally, Plaintiff Crane's journalistic ethics are not protected by Section 1981.  As to the rescission of a job offer to a White applicant, the Second Amended Complaint suggests that Plaintiff Crane continued to work at Defendant well after he rescinded that offer and it was not until after he received his performance review that he quit.  Thus, the allegations of the Second Amended Complaint do not render plausible the claim that he resigned because he was allegedly required to withdraw the offer of employment to the White applicant.  And, although Plaintiff Crane alleges

19

that the situation was "distasteful," he does not describe the situation as "intolerable" and did as he was asked, rescinded the job offer, and continued working for Defendant. *Id.* ¶¶ 81-82; *see also Taylor v. Lexington Cnty. Sheriff's Dep't*, 2019 WL 7900141, at *2-3 (D.S.C. Oct. 11, 2019) (noting employee's continuing to work after her alleged poor treatment "suggests that the working conditions were not objectively intolerable"), *report and recommendation adopted*, 2019 WL 6696062 (D.S.C. Dec. 9, 2019).[9] In any event, Plaintiff Crane has not alleged that he found nor cited any cases supporting that this single instance rendered his work environment objectively intolerable.[10]

Moreover, the article written by Plaintiff Crane, and quoted in the Second Amended Complaint, links the "last year [being] the most difficult of my life" to the stress of the media industry ("ownership changes, deadline shifts, the staffing reduction and print locations") as well as the "ongoing pandemic" rather than any discrimination. Dkt. 56 ¶ 99 (explicitly quoting article in The Herald-Times); Dkt. 59-5 (the article itself); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (finding that the court could consider a Dow Jones article, which was not attached to the complaint, but was attached to the motion to dismiss, "because it was integral to and explicitly relied on in the complaint and because the plaintiffs d[id] not challenge its authenticity"). Indeed, contrary to his assertions now, in his article, Plaintiff Crane credited The Herald-Times with "top-notch journalism," and stated that, "to a person, the H-T newsroom is filled with people devoted to this most noble profession of journalism and the community," and

---

[9] Plaintiff Crane's allegations with respect to the revocation of the job offer are vague and it is unclear who required this of him, when it took place, and whether Plaintiff Crane took any specific action on the basis of the alleged revocation at the time.

[10] Indeed, it is unclear whether Plaintiff Crane continues to assert the constructive discharge claim as the Opposition contained no case authority regarding constructive discharge.

"what sticks out most are the people, and my colleagues and coworkers top the list . . . . [T]he relationships we have in this world are the only things that matter, and I'm grateful for those I formed." *Id.* Nowhere, in explaining his departure, does Plaintiff Crane address the allegations mentioned here, despite his reliance on that article to support his claim. Accordingly, Plaintiff Crane has not plausibly alleged constructive discharge.

With respect to retaliation, Plaintiff Crane argues that "Mr. Crane engaged in a protected activity when voicing his opposition to the RRDP." Dkt. 62 at 25. But here, Plaintiff Crane has alleged no date, such that the Court cannot evaluate the temporal proximity between Plaintiff Crane's alleged protected activities and the alleged material adverse actions of which he complains. *See, e.g., Reardon v. Herring*, 191 F. Supp. 3d 529, 552 (E.D. Va. 2016) ("Here, Reardon's allegations concerning the chronology of her protected activity are so vague that the Court is unable to confidently determine whether temporal proximity might support an inference of causation."); *Green v. Pegasus Steel*, 2023 WL 12086974, at *3 (D.S.C. Dec. 19, 2023) (collecting cases and holding that vague allegations without reference to timeframe are insufficient to establish the causation necessary for a retaliation claim). To the extent that Plaintiff Crane alleges that he was retaliated against through his negative performance review, Plaintiff Crane has failed to establish that his performance review was a materially adverse action. "Courts in this Circuit have rejected retaliation claims based on poor or poorer performance reviews." *Hamilton v. Prince George's Cnty., Md.*, 2019 WL 4735429, at *4-5 (D. Md. Sept. 27, 2019) (citing cases); *Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017) ("A negative performance review, alone, or a placement on a PIP alone, does not constitute a materially adverse action.");[11] *Tang v.*

---

[11] Plaintiff does not address this Court's analysis of the *Emami* decision in the prior *Bradley* decision. As the Court explained there, although Plaintiffs correctly cite *Emami* for the proposition that "there is no authority in the Fourth Circuit that holds that a PIP cannot be a materially adverse

*Eastern Va. Med. Sch.*, 2022 WL 981942, at *8 (E.D. Va. Mar. 30, 2022) (holding that "Plaintiff's negative performance review does not constitute a materially adverse action").  Plaintiff Crane has not alleged that he suffered any consequences as a result of his negative performance review or that it produced any injury to his employment.[12]  To the extent Plaintiff Crane argues that the negative performance review constitutes an adverse action because it negatively impacted his reputation in reliance on *David v. City of Richmond Police Dep't*, 2022 WL 1516314 (E.D. Va. May 13, 2022), Plaintiff Crane has not alleged any damage to his reputation.[13]

Accordingly, Plaintiff Crane has failed to state a claim under Section 1981 because he has not alleged facts that plausibly allege that he was constructively discharged or that he was retaliated against.

_____

action," that does not support the assertion that there was a materially adverse action *here*.  To begin with, Plaintiff Crane does not allege that he was placed on a performance improvement plan. Moreover, as the *Emami* Court recognized, a "negative performance review, *alone*, or a placement on a PIP *alone*, does not constitute a materially adverse action." 241 F. Supp. 3d at 685 (emphasis added).  In *Emami*, the district court held that there was a materially adverse action because "the Plaintiff's PIP was actually implemented, and it imposed conditions with which his failure to comply ultimately led to termination of employment." *Id.*  Those transformative facts are not present here.

[12] Although Plaintiff Crane attempts to allege that the performance review *did* have materially adverse consequences, such allegations are pure speculation. *See Sparenberg v. Eagle Alliance*, 2015 WL 6122809, at *9 (D. Md. Oct. 15, 2015) ("To show that a negative performance review is an adverse employment action, a plaintiff must show 'real, rather than speculative, employment injury.' Here, Sparenberg fails to show the negative performance review led to any further consequences . . . .").

[13] The *David* case is easily distinguished from the facts here.  In *David*, a supervisor threatened to take the plaintiff's "stripes," which was a threat of possible termination. 2022 WL 1516314, at *6.  Even so, the *David* Court held that "the five instances involving Nierman that do not amount to materially adverse decisions on their own may demonstrate retaliation when viewed collectively." *Id.* at *6.  Plaintiff does not allege such systematic retaliation here.

### iii. Noah Hiles

Plaintiff Hiles raises a separate theory of a Section 1981 claim from Plaintiffs Bradley and Crane, in that he alleges that he was paid less than a similarly situated comparator who was not White.  Here, again Plaintiff Hiles fails to address any of the case law that the Court cited in dismissing this claim in the prior *Bradley* decision. 2024 WL 3905817, at *8.  There, the Court noted that Plaintiff Hiles fails to allege that Mr. Upadhyaya was similarly situated in all respects to Plaintiff. *See Cosby v. S.C. Probation, Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (reiterating that comparators must be "similarly situated *in all respects*" in that they "dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it" (emphasis original)).  Indeed, as the Court specifically noted previously, Plaintiff Hiles continues to allege that he and Mr. Upadhyaya were hired at different times in different circumstances.  Courts have recognized that employees are not similarly situated for purposes of pay discrimination where they were "hired . . . at different times." *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 285 (5th Cir. 2015); *Minnis v. Bd. of Sup'rs of La. State Univ. & Ag. & Mech. College*, 55 F. Supp. 3d 864, 880-83 (M.D. La. 2014) (holding no pay discrimination where employees were "hired at different times" and the employer had to make adjustments to pay based on different circumstances).  Plaintiff Hiles also continues to allege that Mr. Upadhyaya received a higher salary to ensure that he would accept the position, after two prior applicants declined the position, and that Plaintiff Hiles did not receive a raise when he first sought one because raises were evaluated at the end of the year based on performance. Dkt. 56 ¶¶ 106-08.  Moreover, Plaintiff Hiles pleads that, when Defendant conducted its review, he did receive a raise, although he asserts that his raise still places him on a different pay scale than Mr. Upadhyaya.

*Id.* ¶ 110 (alleging that Plaintiff Hiles received an unspecified raise). Accordingly, Plaintiff Hiles has failed to plead facts that plausibly allege a race-based pay disparity sufficient to state a claim under § 1981.

### iv.  Barbara Augsdorfer

Plaintiff Augsdorfer again introduces a new theory of recovery for her Section 1981 claim based on her reassignment, and she also relies on her termination. Plaintiff Augsdorfer has not alleged facts demonstrating that her change in assignment constitutes an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) ("The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action."); *see also Lebow v. Meredith Corp.*, 484 F. Supp. 2d 1201, 1214 (D. Kan. 2007) (holding that change in broadcast assignments was not an adverse employment action); *cf. Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1082 (3d Cir. 1992) (holding that "employment status was virtually unchanged" where plaintiff was "reassigned from the 'courthouse beat' to a 'demeaning' general reporting assignment" where the reassignment "would have involved no loss of pay or change in title"). The Court cited each of these cases in its prior opinion. *See Bradley*, 2024 WL 3905817, at *9 (citing same cases). Yet, Plaintiff Augsdorfer does not address them, nor does she cite any other case pursuant to which Plaintiff could distinguish her case from those relied upon by the Court. Thus, Plaintiff Augsdorfer cannot premise her Section 1981 claim on her beat reassignment.

With respect to Plaintiff Augsdorfer's termination claim, plaintiffs are required to plead that they are satisfactorily performing their job and that they were treated differently from a similarly situated comparator or otherwise terminated in circumstances giving rise to an inference of discrimination. *See Spellman v. Sch. Bd. of City of Chesapeake, Va.*, 2018 WL 2085276, at *5

24

(E.D. Va. Apr. 5, 2018). Here, Plaintiff Augsdorfer does not plead that she was satisfactorily performing her job at the time of her discharge; rather, Plaintiff Augsdorfer pleads that she had been informed that "her performance was not up to par" and that she was "placed on a performance plan." Dkt. 56 ¶ 122; *see also Edouard v. John S. Conner, Inc.*, 2023 WL 3127622, at *5 (E.D. Va. Apr. 27, 2023) (dismissing discrimination claim where "the Complaint is devoid of factual assertions that would allow the Court reasonably to infer that Plaintiff's job performance was satisfactory at the time of her termination"). Although Plaintiff Augsdorfer alleges that she was surprised to be told she was not performing well, she does not affirmatively allege that she was performing well or any facts from which the Court could determine that she was performing well. Nor has Plaintiff Augsdorfer pleaded facts from which it could be inferred that race discrimination was the but-for cause of her termination.[14] Accordingly, Plaintiff Augsdorfer has failed to state a plausible claim of race discrimination under Section 1981.

*v.   Logan Barry*

Plaintiff Barry alleges a new theory of Section 1981: a failure to promote claim. To do so, Plaintiff Barry must allege facts demonstrating that he was not promoted in circumstances giving rise to an inference of discrimination. Although still a close call, Plaintiff Barry has remedied the defects previously identified in the Amended Complaint. Plaintiff Barry now alleges that he would have applied for the position had it been posted and that Defendant's management "repeatedly told

---

[14] To the extent Plaintiff Augsdorfer relies on the failure to turn over contacts for her new beat assignment, this fails to create an inference of discrimination because Plaintiff's allegations imply that no one was previously covering these counties ("transfer was necessary as coverage of these two counties was a necessity") or that anyone had any contacts to give. Dkt. 56 ¶¶ 120-21. Additionally, Plaintiff's allegation that she was moved to a position that Defendant knew would be eliminated is speculation unsupported by any factual allegations, as Plaintiff Augsdorfer does not include any allegations about who "knew" the position would be eliminated or even who made the decision to terminate her employment.

Mr. Barry that he was the most qualified for the role" and "more qualified than other employees." Dkt. 56 ¶ 129. Taking these allegations as true and taking into account *Duvall*, the Court finds that Plaintiff Barry has plausibly alleged a failure to promote claim sufficient to survive a motion to dismiss. Thus, the Motion will be denied with respect to Plaintiff Barry.

*    *    *

In sum, the Second Amended Complaint has only added new allegations sufficient to address the defects previously noted by the Court with respect to Plaintiff Barry. Indeed, by and large, Plaintiffs failed to address this Court's prior opinion at all. Thus, each of the named Plaintiffs – except for Plaintiff Barry – has failed to state a claim for relief pursuant to Section 1981. Accordingly, the Motion to Dismiss will be granted with respect to Plaintiffs Bradley, Crane, Hiles, and Augsdorfer. The Motion will be denied with respect to Plaintiff Barry.

## B.  Class Claims

Defendant next seeks to dismiss or strike the class allegations. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, one or more putative class members may sue as representatives of the class if they satisfy the following threshold requirements: (i) numerosity; (ii) commonality; (iii) typicality; (iv) adequacy of representation; and (v) ascertainability. *See Peters v. Aetna, Inc.*, 2 F.4th 199, 241-42 (4th Cir. 2021) (citing Fed. R. Civ. P. 23(a)). Once these threshold requirements are met, putative class members must also satisfy Rule 23(b) by showing that either: (a) individual actions would risk inconsistent or non-dispositive judgments, (b) that they are seeking class-wide injunctive or declaratory relief, or (c) that there are common legal or factual questions that predominate over any other concerns affecting individual members. *Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (citing Fed. R. Civ. P. 23(b)).

26

The Supreme Court has made clear that it is "quite obvious[]" that "the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can be productively litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Fourth Circuit has also cautioned that, "[i]n a very broad and loose sense, any member of any [protected] class who [allegedly] suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but [it is] clear that is not [a ground for class certification]." *Adams v. Bethlehem Steel Corp.*, 736 F.3d 992, 995 (4th Cir. 1984) (citations omitted).

To begin with, Defendant again correctly argues that the proposed class is not ascertainable. The Proposed Class is exactly the same as the Proposed Class that the Court previously found to be not ascertainable. *Bradley*, 2024 WL 3905817, at *10. The Proposed Class consists of

> [A]ll individuals who were subject to defendant's [sic] Reverse Race Discrimination Policy described below and who 1) either work or worked for Gannett based on any form of contractual relationship 2) [sic] or were considered by Gannett to be placed into a position to perform work for the Defendant based on any form of contractual relationship.

Dkt. 28 ¶ 34; Dkt. 56 ¶ 44. Again, by Plaintiffs' own allegations *every* employee was "subject to" the Policy. *Id.* ¶ 21 (alleging that the Policy was "company-wide"). Thus, the Proposed Class includes every employee who has worked for Defendant while the Policy was in place and every person who applied for a position with Defendant while the Policy was in place. But it is clear that Plaintiffs do not intend to plead that *every* person will have been adversely affected by the Policy; indeed, they plead the opposite. Pursuant to Plaintiffs' Proposed Class definition, Ms. Rayam, Ms. Magee, and Mr. Upadhyaya would all fall into the Class, but Plaintiffs surely do not intend to include them in the Class. *See, e.g., id.* ¶ 66 (alleging Ms. Rayam, who would have been "subject to" the Policy as an employee, was a beneficiary of the Policy). Moreover, because the

Proposed Class includes "all *individuals*" it could also include the supervisors, managers, or other employees charged with *implementing* the Policy. Furthermore, even though all of the named Plaintiffs were involved in the newsroom, the breadth of the Proposed Class as "all *individuals*" employed by Defendant would inevitably include persons vastly differently situated from the Named Plaintiffs such as human resources staff, IT professionals, and perhaps janitorial staff. Given Plaintiffs' Proposed Class definition, large swaths of potential class members would not even have a plausible cause of action because they would not have suffered any adverse employment action and that is not a requirement to be a member of the class. Being subject to policy without any attendant loss or damages does not provide a person with a cause of action under Section 1981. *Comcast Corp.*, 589 U.S. at 341 (holding that a plaintiff must show "but for race, [he or she] would not have suffered the loss of a legally protected right"). Indeed, Plaintiffs disclaim a definition of the Proposed Class that would ensure that all class members have a cause of action. *See* Dkt. 62 at 34 ("Plaintiffs are *not* proposing a class defined as all individuals 'who were subject to or *who experienced discrimination*.'" (emphasis added)). Even more confusingly, Plaintiffs reject that membership in the Proposed Class is "contingent on whether the individual has a valid claim." Dkt. 62 at 35.[15] Thus, there is no plausible way to "readily identify the class

---

[15] For the sake of clarity, the Court includes the entire sentence which is quoted in part above: "In contrast to [P]laintiffs in the present action, the plaintiffs in *Campbell* did not seek to certify a class of individuals subject to a singular specifically defined policy, but rather made their inclusion in the class contingent on whether the individual has a valid claim, *e.g.*, whether they have been discriminated against because of their race and color." Dkt. 62 at 35. Thus, Plaintiffs seem to suggest that an individual can be a member of a class under Section 1981 *without* having a valid claim and recover as a member of the class without having ever suffered any discrimination or damages. The Court understands that Plaintiffs were seeking to avoid case law from various courts indicating that claims where "membership in the class [is] contingent on individualized merits determinations as to whether the individual suffered discrimination because of his race" are improper. Dkt. 60 at 29-30 (citing cases regarding so-called "fail-safe" classes). But that does not mean that Plaintiffs can include in the proposed class persons who have no injury. Rather, the means of threading that needle is to identify a specific injury caused by the Policy, *i.e.*, a class

members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (holding that, "[w]here it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegations on the pleadings").    Despite notice of some of these deficiencies, Plaintiffs neither corrected the definition of the Proposed Class in their Second Amended Complaint nor addressed the Court's prior opinion in their Opposition.

In their Opposition, Plaintiffs appear to recognize the difficulties of ascertaining the scope of the Proposed Class and seek to add parameters to the class definition not clear from the Second Amended Complaint.    Namely, Plaintiffs assert: "The identity of the members of the proposed class would be those subject to the [sic] Gannett's RRDP and includes those who identified or will identify as a part of any of the above referenced racial groups except for those who identify as Black or African American." Dkt. 62 at 33.    But the Proposed Class as defined by the Second Amended Complaint does not so limit the class (Dkt. 56 ¶ 44) and it is "axiomatic that a complaint may not be amended by briefs in opposition to a motion to dismiss." *Sansone v. U.S. Patent & Trademark Off.*, 2025 WL 696527, at *4 (E.D. Va. Mar. 4, 2025).    Moreover, Defendant correctly points out that including persons who "will identify" at some point in the future as a race other than Black or African American the class is by definition not ascertainable now.    Dkt. 63 at 14.

---

consisting of all White, men not hired into a newsroom during the alleged existence of the Policy. But, Plaintiffs have not done so here (nor do they suggest that could or would do so consistent with Rule 23); rather, Plaintiffs chose to expand the definition of the class so broadly so as to sweep in persons who could not possibly have a claim.    Thus, the allegations here only go to show that a class is not appropriate.    The class is simply "too broad and too ill-defined." *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 681 (4th Cir. 2024).    As the Fourth Circuit has indicated, it is improper to have a class where the class definition "risk[s] including individuals who would not have a right to recovery but for the sweeping scope of the class." *Stafford*, 123 F.4th at 681; *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the [class] definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad.").    Thus, Plaintiffs' arguments in this regard do not save their class claims.

Plaintiff's other argument, that there can be no conflicts because "all class members have the same interest – for decisions regarding their employment to not be made on the basis of their race," (Dkt. 62 at 33), ignores Plaintiffs' own allegations regarding how certain class members benefit from the Policy, ignores that managers charged with implementing the policy are included in the Policy, and ignores that the Proposed Class includes persons who have suffered no damages at all.

The Proposed Class also again suffers deficiencies with respect to commonality. As evidenced just by the named Plaintiffs, the Proposed Class seeks to bring claims based on at least five different legal theories: (i) discharge; (ii) constructive discharge; (iii) failure to promote; (iv) retaliation; and (v) pay disparity. Each of these different legal theories involves a different application of a *prima facie* case under *McDonnell-Douglas*. *See Albritton v. Norfolk Redevelopment & Housing Auth.*, 935 F.2d 1285 (4th Cir. 1991) (describing disparate treatment, retaliation, failure-to-promote, and wrongful discharge as separate theories). Moreover, although Plaintiffs have alleged a company-wide policy, Plaintiffs have not alleged any facts regarding how the Policy was distributed to the "over 100 brands employing newsroom members" or who within any given newsroom was charged with implementing the Policy. Dkt. 56 ¶ 45. Thus, with respect to any individual employment decision, decisionmakers are going to be exercising a high level of discretion. As evidenced by Plaintiff Bradley, there may also be employees within the class who have waived their rights pursuant to separation agreements. Any resolution of these issues will necessarily require mini-trials focused on the particular theory of discrimination or retaliation that examines the specifics of the relevant position, the qualifications required, and the individual decisionmaker. *See Stafford*, 123 F.4th at 681-82 ("The sweeping class definition before us instead raises the obvious issue that the district court may inadvertently be lumping together a great many disparate plaintiffs with widely varying individual claims. Thus, in the absence of more precise

class parameters, we cannot assure ourselves that the classes meet Rule 23(a)'s commonality requirement.").

As in the *Dukes* case, Plaintiffs would all be seeking relief based on different theories of recovery, based on different positions, at different newspapers, in different areas of the country, with different decisionmakers. *See* 564 U.S. at 359-60 (agreeing with Judge Kozinski that the only things the plaintiffs have in common is "their sex and this lawsuit"). Indeed, Plaintiffs have even less in common than the *Dukes* plaintiffs because there the plaintiffs were all the same sex. Here, the Proposed Class is not limited to White individuals, even though all the named Plaintiffs appear to be White. Here, Plaintiffs have failed to provide allegations overcoming the "wide gap" between an individual claiming that he or she was subject to a policy of discrimination, and the existence of a class of persons who have suffered the same injury,[16] such that the claims share common questions of law or fact. *Dukes*, 564 U.S. at 352-53. The Fourth Circuit has recently emphasized that where the "core proof of each" class members' claim would have to center on "individual" determinations the claims are "not capable of classwide resolution, as they cannot be

---

[16] Plaintiffs identify two purported injuries when describing their Proposed Class. The first is "the indignity of discrimination and invasion of their right to be free from discrimination." Dkt. 56 ¶ 134. But the way the alleged discrimination is expressed for purposes of this Section 1981 action is through a variety of adverse employment actions or materially adverse actions. And it is clear just from a review of the claimed harms by the named Plaintiffs that the adverse actions that could be experienced by the class are varied and not at all common across the class – *i.e.* adverse transfers, retaliations, failure to hire, termination, failure to promote, and failure to provide equal pay. The other alleged injury is that the Proposed class "suffer[ed] the right to seek future employment from Defendant." *Id.* ¶ 135. It is entirely unclear to what this alleged injury is intended to refer. The damages obtainable would also vary widely amongst class members, as Plaintiff seek "the value of lost wages, back pay, including lost fringe benefits," as well as restoration "to their rightful positions" or, "in lieu of reinstatements, an order for front pay benefits." *Id.* at 23. Moreover, Plaintiffs seek damages "to reasonable [sic] compensate Named Plaintiffs and the Class for the humiliation, indignity, embarrassment, damage to her [sic] reputation, emotional distress, emotional pain and suffering and the loss of enjoyment of life," which would necessarily require individual determinations as to each Proposed Class Member. *Id.*

resolved 'in one stroke.'" *Freeman v. Progressive Direct Ins. Co.*, 2025 WL 2435366, at \*6 (4th Cir. Aug. 25, 2025). As in *Freeman*, the "questions presented by this case will not generate common answers that drive the litigation," such that the Court cannot find "commonality and necessarily predominance." *Id.*[17] Indeed, this case is very different from the kind of discrimination cases where classes can be certified, as they generally involve a single entity as opposed to the 100 brands at issue here. *See, e.g.*, *Brown v. Nucor Corp.*, 785 F.3d 895, (4th Cir. 2015) ("But for a localized, circumscribed class of workers at a single facility, a policy of subjective, discretionary decision-making can more easily form the basis of Title VII liability, particularly when paired with a clear showing of pervasive racial hostility.").

Given the lack of ascertainability of the Proposed Class and the critical questions that must be answered on an individualized basis, the Court concludes that it is appropriate to strike the class allegations from the Amended Complaint. *See Dukes*, 564 U.S. at 350 ("Dissimilarities within the proposed class" often "impede the generation of common answers.").

## IV. CONCLUSION

In sum, it is apparent that each of the Named Plaintiffs' claims of discrimination, with the exception of Plaintiff Barry, will be dismissed for failure to state a claim and that the class allegations will be stricken from the Second Amended Complaint based on their failure to facially establish the ascertainability of the Proposed Class and the commonality of issues presented by the Proposed Class. Moreover, because this is Plaintiffs' Second Amended Complaint and because the Plaintiffs generally failed to materially alter their allegations in the face of the prior

---

[17] *See also Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 638, 651 (6th Cir. 2006) ("But in a Title VII case, whether the discriminatory practice actually was responsible for the individual class member's harm, the applicability of nondiscriminatory reasons for the action, showings of pretext, and any affirmative defense all must be analyzed on an individual basis.").

Memorandum Opinion and Order, it appears that permitting further amendment is futile and no further leave will be granted.

Accordingly, it is hereby ORDERED that the Motion to Dismiss (Dkt. 59) is GRANTED-IN-PART and DENIED-IN-PART. The motion is granted in all respects except with respect to the claims of Plaintiff Barry; and it is

FURTHER ORDERED that claims of Plaintiffs Bradley, Crane, Hiles, and Augsdorfer are DISMISSED; and it is

FURTHER ORDERED that the class allegations are STRUCK from the Second Amended Complaint; and it is

FURTHER ORDERED that this case will proceed only with respect to the allegations of Plaintiff Barry and a scheduling order will issue promptly.

It is SO ORDERED.

Alexandria, Virginia
September 3 , 2025

/s/

Rossie D. Alston, Jr.
United States District Judge